[No. 5803–1–II. Division Two. June 15, 1983.]

PREMIUM DISTRIBUTING CO., INC., *Respondent,* v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS UNION LOCAL 174, ET AL, *Appellants.*

*William A. Roberts,* for appellants.

*Warren Ogden* and *Mark S. Davidson,* for respondent.

WORSWICK, A.C.J.—The International Brotherhood of Teamsters Union Local 174 appeals an order and judgment holding it in contempt for violating a temporary injunction and awarding damages to respondent, Premium Distributing Company, Inc. The Union contends that the evidence was insufficient to support a finding of its contempt liability under the "clear proof" standard of RCW 49.32.070.[1] It also contends that the evidence was insufficient to support the damage award. We affirm.

The Union commenced a strike against Premium on December 8, 1980. On December 23 Premium obtained an injunction prohibiting the Union and its members from committing acts of misconduct but was unsuccessful in enforcing it because no surety bond had been posted. On January 14, 1981 a second injunction was issued. It restrained the Union and its members from physically obstructing Premium's premises and the entrances thereto, threatening or assaulting Premium's employees, damaging its property, especially motor vehicles, and maintaining more than two pickets at any one time at each gate of Premium's plant. The injunction also contained the following provision:

> (i) The parties agree as follows:
>    In the event further incidents of violence are reported to the company involving its agents, employees, customers, guests or equipment, the company shall immediately report said incident to either Robert L. Cooper or Rod Schmidt of Teamsters Local No. 174. One of those two individuals shall meet within twenty–four (24) hours with either James Cianciolo or Steven Christenson from the company. The parties shall complete an investigation of the incident within

---

[1]This statute was taken verbatim from the Norris–LaGuardia Act, 29 U.S.C. § 106.

twenty–four (24) hours from the time of the incident and in good faith attempt to arrive at an agreement as to the individual or individuals responsible. Upon agreement, said individual shall, at a minimum, be removed from the picketing activities involving Premium Distributors, Inc.

On January 20, Premium again moved for a contempt order against the Union and several others. A hearing on this application began on February 19 and extended through March 4, at the conclusion of which the court found that the Union and certain of its officers and agents had violated the January 14 injunction, and held them in contempt. The Union was ordered to pay $15,000 to Premium as restitution, and $5,000 toward attorney's fees. The judgment also stated that Premium "is not prejudiced nor hereby waives any or all claims of action, damages, or remedies of law or other, either civil or criminal, to which they are or may become entitled." This appeal followed.

■ Application and interpretation of RCW 49.32.070 are central to the issues presented. It provides:

No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the state of Washington for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

Premium contends the statute is only applicable when an injunction is obtained and does not apply to contempt proceedings. This is plainly incorrect. The Legislature specifically stated in the title to the act, of which RCW 49.32.070 is a part, that it was applicable to contempt matters arising out of the violations of injunctions. Laws of 1933, 1st Ex. Sess., ch. 7. *See also Buchanan v. International Bhd. of Teamsters,* 94 Wn.2d 508, 617 P.2d 1004 (1980); *Titus v. Tacoma Smeltermen's Local 25,* 62 Wn.2d 461, 383 P.2d 504 (1963).

The statute requires clear proof of union participation in,

authorization of, or ratification of, contemptuous acts only in order to impose liability on a union. The statute does not require such proof in the first instance that contemptuous acts were committed. We conclude, therefore, that the commission of such acts can be proved by a preponderance of evidence.[2] *See Ramsey v. United Mine Workers,* 401 U.S. 302, 28 L. Ed. 2d 64, 91 S. Ct. 658 (1971).

The Union does not, and could not, seriously contend that the evidence before the trial court was insufficient to prove a multitude of contemptuous acts by a preponderance of the evidence. Based upon a massive record, the court found almost daily violations. It found that Union members engaged in mass picketing, harassed plaintiff's employees in traffic, placed nails under tires, cut hydraulic lines, cut tires, and physically assaulted plaintiff's employees, all in flagrant violation of the January 14 injunction.

Was it established by "clear proof" that the Union participated in, authorized, or ratified such misconduct? We hold that it was.

■ "Authorization" means that the violation had been expressly authorized or necessarily followed from a granted authority by the local Union. *United Bhd. of Carpenters v. United States,* 330 U.S. 395, 91 L. Ed. 973, 67 S. Ct. 775 (1947). "Ratification" means that the Union approved of the violations, or that it participated actively or by knowing tolerance in further acts which were themselves actionable or intentionally drew upon the previous violence for their force. *United Bhd. of Carpenters v. United States, supra.*

■ The "clear proof" standard requires a plaintiff to come forward with more than a preponderance of the evidence; to prevail, he must persuade by a substantial margin. *United Mine Workers v. Gibbs,* 383 U.S. 715, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966). As with all standards of proof, once evidence has been produced that is of a quality

---

[2]Evidence preponderates when it is more convincing to the trier of fact than is the opposing evidence. E. Cleary, *McCormick on Evidence* § 339, at 793 (2d ed. 1972).

and quantity to provide the necessary margin, it is for the trier of fact to determine subjectively whether it is persuaded that the alleged fact is true.[3] *See* E. Cleary, *McCormick on Evidence* § 336, at 784, 793 (2d ed. 1972). In reviewing the trial court's findings under any standard of proof, an appellate court can only determine whether any reasonable trier of fact would be justified in reaching them upon the evidence measured by the required standard. *See, e.g., State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980) (beyond a reasonable doubt); *Vermette v. Andersen,* 16 Wn. App. 466, 558 P.2d 258 (1976) (clear, cogent and convincing).

The Union appears to contend that the "clear proof" standard requires direct, positive, essentially undisputed, even formal and official evidence of its actions—*e.g.,* a union vote recorded in its official minutes. We disagree.

In order for contempt actions ever to be enforced against unions, the "clear proof" standard must allow for evidence that is something other than what the Union suggests. In saying this, however, we are not unmindful that the purpose behind the federal counterpart[4] to RCW 49.32.070 is to relieve labor organizations from liability for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization actually participated in, authorized, or ratified such lawless acts. *See United Bhd. of Carpenters v. United States, supra.* Thus, "clear proof" requires something more than that required to show ordinary vicarious agency liability.

Other cases, both state and federal, offer guidance. We

---

[3]For example, the standard of beyond a reasonable doubt "impress[es] upon the factfinder the need to reach a *subjective* state of near certitude of the guilt of the accused". (Italics ours.) *Jackson v. Virginia,* 443 U.S. 307, 315, 61 L. Ed. 2d 560, 571, 99 S. Ct. 2781 (1979).

[4]29 U.S.C. § 106. When a state borrows federal legislation it also borrows the construction placed upon such legislation by the federal courts. *Juanita Bay Vly. Comm'ty Ass'n v. Kirkland,* 9 Wn. App. 59, 510 P.2d 1140 (1973).

first note that it is virtually impossible to prove union liability through the actions of unidentified individuals. *E.g.*, *Rochester Tel. Corp. v. Communication Workers*, 456 F.2d 1057 (2d Cir. 1972); *Ritchie v. United Mine Workers*, 410 F.2d 827 (6th Cir. 1969); *Roddy v. Independent Oil & Chem. Workers Union*, 181 So. 2d 285 (La. Ct. App. 1965). Next, we see that it is much more difficult to prove international union liability than local union liability. *Compare Marlite Div. Masonite Corp. v. United Papermakers*, 42 Ohio Op. 2d 19, 225 N.E.2d 862 (Tuscarawas C.P. 1967) *with Dow Chem. Co. v. International Union of Elec., Radio & Mach. Workers*, 480 F.2d 433 (5th Cir. 1973), *cert. denied*, 415 U.S. 932 (1974); *and Artesia v. United Steel Workers*, 87 N.M. 134, 529 P.2d 1255 (1974). Finally, we observe that if an offending officer is high enough in union leadership, his participation in, authorization, and ratification of misconduct makes the union itself liable. *E.g.*, *United Mine Workers v. Meadow Creek Coal Co.*, 263 F.2d 52 (6th Cir.), *cert. denied*, 359 U.S. 1013 (1959) (involving board member of international union). Reviewing this record in the light of the foregoing principles and illustrative decisions, we conclude that the evidence, in quality and quantity, was sufficient to provide the margin of persuasion required by the "clear proof" standard.

Here, many Union members, including Mirante, Kelly, Lombardi, and Ewing, were identified by name. Lombardi, a trustee and officer of the Union, was involved in five separate incidents of violence and misconduct from January 20 to February 2. Except for one occasion, he was always accompanied by a different union member. Kelly and Mirante were shop stewards and acted as picket captains during the strike. Both violated the injunction by engaging in mass picketing. Ewing, a business agent, threatened and intimidated one of Premium's employees. Considering collectively the acts of Mirante, Kelly, Lombardi, and Ewing, there are more than enough ties with the Union leadership to persuade a trier of fact by a substantial margin that the Union itself participated in the violations. Moreover,

because of the almost daily incidents of misconduct by Union members, because Union members routinely accompanied the aforementioned individuals in such acts of misconduct, and because they all had full knowledge of the injunction's terms, there is also clear proof from which a trier of fact could find that the Union authorized the misconduct by participation of Union leadership and ratified the misconduct by its knowing tolerance.

The Union is further inculpated in participating in, authorizing, and ratifying the misconduct because, as the court found, Rod Schmidt, a Union business agent, failed to comply with section (i) of the injunction. As the trial court's oral opinion points out, Schmidt did not make a good faith effort to investigate, and to reach an agreement regarding, the parties responsible for the reported acts of violence. Good faith requires the exercise of due diligence to learn the truth. The record discloses that when, on numerous occasions, Premium informed Schmidt of the names of strikers who had engaged in acts of violence, Schmidt would merely ask these individuals of their involvement and, upon receiving denials, do nothing more. By not pursuing these complaints to any greater degree, Schmidt effectively condoned further acts of violence.

The Union contends that because the plaintiff did not give it enough information regarding the incidents of violence, it should not be held in contempt for its inability to comply with section (i). *See State ex rel. Ewing v. Morris,* 120 Wash. 146, 207 P. 18 (1922). Substantial evidence comporting with the clear proof test, however, supports the finding that Premium sufficiently reported incidents of violence to the Union in accordance with section (i). Moreover, it is apparent that the real significance of this violation is in what it demonstrated as to the Union's overall attitude.

The Union contends that the evidence was insufficient to support the damage award of $15,000. It argues that, at most, it could only be responsible for damage sustained after January 14, and there was no segregation of damages between the pre– and post–January 14 periods. We dis-

agree.

■ RCW 7.20.100 allows a court to grant indemnity for damages caused by another party's contempt. However, such allowance may be made only upon sufficient proof. *State ex rel. Lemon v. Coffin*, 52 Wn.2d 894, 327 P.2d 741, 332 P.2d 1096 (1958). As to what is sufficient proof, a party need not prove damages with mathematical certainty where the fact of damage is well established. *Edwards Contracting Co. v. Port of Tacoma*, 83 Wn.2d 7, 514 P.2d 1381 (1973). Evidence of damage is sufficient if it affords a reasonable basis for estimating the loss and does not require the trier of fact to resort to speculation or conjecture. *Topline Equip., Inc. v. Stan Witty Land, Inc.*, 31 Wn. App. 86, 639 P.2d 825 (1982).

A Premium employee testified that from the start of the strike, December 5, 1980, until February 19, 1981, the plaintiff sustained tire damage amounting to $24,000, and damages because of punctured radiators and cut hydraulic lines of $7,000 to $8,000. The record discloses that almost 100 tires were damaged from January 14 through the conclusion of the trial. During the same time there were almost a dozen incidents of hydraulic lines and cables being cut, wiring being ripped from trucks, and radiators being punctured. When considered in light of testimony that, during the entire strike, 246 tires were damaged, 23 radiators were punctured, and approximately 15 hydraulic lines and brake lines were cut, it becomes clear that the court determined Premium's proportionate loss during the period covered by the injunction. Because of the facts of damage before it, and because of evidence of the total loss, the court's calculation was reasonable.

■ Finally, the Union contends that the court erred by stating in the order and judgment that Premium was not prejudiced from bringing any other action for losses incurred by reason of the Union's contempt of the January 14 injunction. We agree, to the extent that the questioned language could be interpreted as allowing additional proceedings which might result in a further award of damages

for violation of the January 14 injunction. RCW 7.20.100 states that when a party sues for damages caused by violation of an injunction, the "judgment . . . is a bar to any action, suit or proceeding by the aggrieved party for such loss or injury." The purpose of this provision is to provide complete recovery in the original action and to eliminate the necessity of a second suit to recover the expense caused by such contempt. *State ex rel. Lemon v. Coffin, supra.* Thus, Premium is precluded from seeking recovery for any other loss incurred because of the Union's contempt of the January 14 injunction. It is not, however, precluded from seeking damages for misconduct occurring before January 14.

The questioned language only adds confusion. Whatever legal consequences flow from this adjudication should be determined at the proper time in another forum. Therefore, the practical and proper resolution of this issue is to delete paragraph 4, page 6, of the order and judgment dated May 19, 1981. It is so ordered. In all other respects, that order and judgment is affirmed.

PETRIE and REED, JJ., concur.

Reconsideration denied July 11, 1983.

Review denied by Supreme Court October 21, 1983.