IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

|  |  |  |
|---|---|---|
| In the Matter of RAPID SETTLEMENTS, LTD'S APPLICATION FOR APPROVAL OF TRANSFER OF STRUCTURED SETTLEMENT PAYMENT RIGHTS | ) ) ) ) ) ) ) ) | No. 31435-9-III<br><br><br><br>PUBLISHED OPINION |

SIDDOWAY, C.J. — Symetra Life Insurance Company and Symetra Assigned Benefit Services Company (Symetra) obtained an antisuit temporary restraining order (TRO) enjoining RSL-3B-IL, Ltd. (3B) from collaterally attacking Symetra's final Washington order against 3B in Texas courts. When 3B violated the TRO, Symetra filed a motion for contempt against 3B and its Texas lawyer, John Gorman.

As a result of removal of the Washington action to federal court, its remand, and a continuance, Symetra's motion for contempt was not heard by the Benton County court for four months. By that time, 3B's collateral attack on Symetra's final order had been removed by Symetra to federal district court in Texas.

The superior court found 3B and Mr. Gorman in contempt, ordered Mr. Gorman to pay a one-time forfeiture of $1,000 and ruled that to purge themselves of the contempt charge, 3B and Mr. Gorman must strike all pending motions in the "Harris County,

Texas, action" and agree not to take further action in that case as long as they were subject to a Benton County court injunction. Clerk's Papers (CP) at 526. The court also awarded Symetra substantial attorney fees and costs. 3B and Mr. Gorman appeal, arguing that the forfeiture amount and fees and costs awarded are punitive sanctions that could not be imposed in a civil contempt proceeding and, for the first time on appeal, that the purge condition was not possible to perform and was therefore invalid.

We conclude that only part of Symetra's fees and costs were properly awarded. But where 3B and Mr. Gorman committed clear acts of contempt and failed in the trial court to assert and support what they now contend was their inability to perform the purge condition, the relief ordered by the court was largely proper. We reverse the award of loss and costs, remand for further review and recalculation by the court, and otherwise affirm.

## FACTS AND PROCEDURAL BACKGROUND

Symetra and 3B are both engaged in businesses involving structured settlements. As explained in a legislative report on what became Washington's Structured Settlement Protection Act (SSPA), chapter 19.205 RCW:

> In the settlement of large tort claims, damages are often paid by a defendant to a plaintiff in the form of a structured settlement. In its simplest form, a structured settlement typically involves the initial payment of a lump sum, followed by a series of subsequent smaller payments that are made at specified intervals over a period of years (an annuity).

> . . . Structured settlements are usually paid by an insurance company
> (the obligor), that obtains a benefit by paying off the obligation in
> installments over a long period of time, rather than as a single lump sum.
> The recipient of the structured settlement proceeds (the payee) can benefit
> as well, since the annuity payments are not subject to federal income tax
> and the receipt of payments over the long term can provide financial
> security.

FINAL BILL REP. ON ENGROSSED H.B. 1347, at 1, 57th Leg., Reg. Sess. (Wash. 2001).

The legislature enacted the SSPA after it became common for injured persons to be offered discounted payments in exchange for their entitlements under a structured settlement, by companies that hoped to profit from the investment. The SSPA reflected the legislature's concern that payees not be permitted to sell annuity rights until a court had reviewed the proposed transfer for adequate disclosure and determined that a transfer was in the best interest of the injured person, taking into account the welfare and support of his or her dependents. *See* RCW 19.205.030 (requiring court or agency approval).

Symetra is engaged in the business of assuming the obligation to pay a tort liability and then fulfilling it through structured settlement payments. 3B and at least one of its affiliates, Rapid Settlements, Ltd. (RSL)[1] are engaged in the business of buying injured persons' future payment rights at a discount.

---

[1] RSL is now known as Liquidated Marketing, Ltd. This fact and others relating to Washington proceedings taking place before February 2012 are drawn from this court's earlier decision in *In re Rapid Settlements, Ltd.*, 166 Wn. App. 683, 271 P.3d 925 (2012).

3

In July 2004, a structured settlement payee agreed to sell a future payment due him from Symetra to RSL. As the investor, RSL was required by the SSPA to seek approval of the transfer in superior court. Symetra opposed RSL's application as violating requirements of the SSPA. The court agreed, dismissed RSL's application, and awarded Symetra its reasonable attorney fees and costs under RCW 19.205.040(2)(b).[2] RSL unsuccessfully appealed the award of fees to the Court of Appeals and unsuccessfully sought review by our Supreme Court. *Rapid Settlements, Ltd. v. Symetra Life Ins. Co.*, 134 Wn. App. 329, 332, 139 P.3d 411 (2006), *review denied*, 160 Wn.2d 1015, (2007)). Additional fees and costs were awarded to Symetra at both levels of appeal. In 2008, the King County Superior Court entered an amended judgment of $39,287.04 against RSL reflecting the cumulative fees and costs.

Symetra unsuccessfully attempted to collect the judgment in both Washington and Texas. Efforts to collect in Washington proved unsuccessful because only RSL's affiliates, not RSL, maintain bank accounts in Washington. Symetra's efforts to collect the judgment in Texas were met with RSL's response to post-judgment discovery that it owned no property, even in its home state.

---

[2] RCW 19.205.040(2) provides in relevant part that a transferee "shall be liable to the structured settlement obligor and the annuity issuer . . . (b) For any other liabilities or costs, including reasonable costs and attorneys' fees . . . arising as a consequence of the transferee's failure to comply with this chapter."

4

In a then unrelated proceeding, RSL had applied in Benton County in November 2004 for approval of a transfer agreement under which Nicholas Reihs would sell a future payment from Symetra (payable in September 2012) in exchange for a discounted payment. Over Symetra's objection, the court approved the transfer. Although RSL's transfer application listed itself as the transferee, the order approving the transfer stated that the designated beneficiary had been changed to 3B.

Five years after the court order approving transfer of the Reihs payment but before it came due, Symetra moved to modify the order to allow it to apply the amount otherwise payable to 3B to its King County judgment against RSL. Over the objection of 3B, which was allowed to intervene, the superior court found that 3B was the alter ego of RSL and modified the transfer order to recognize a right of setoff in Symetra. 3B appealed. We affirmed the superior court's modified order in February 2012. *In re Rapid Settlements, Ltd.*, 166 Wn. App. at 696.

3B then revived an action it had commenced in Texas two years earlier (shortly after Symetra asked the Benton County court to authorize setoff) in which it challenged Symetra's ability to collect its judgment through a setoff taking place in Washington. At Symetra's request, the Texas court had stayed the action—"abated" it, in Texas terms—pending disposition of 3B's appeal in Washington.

Following our decision on the appeal, John Craddock, one of Mr. Gorman's law partners, wrote Symetra's lawyers, stating that 3B continued to assert a right to receive

the upcoming September 2012 Reihs payment and that two creditors, FinServ Casualty Corporation and A.M.Y. Property & Casualty Corporation, asserted prior secured interests in the payment. On August 9, Mr. Craddock notified Symetra's lawyers that 3B would move to vacate the abatement order in the Texas action and would seek an order requiring Symetra to deposit the September Reihs payment in the Texas court. Symetra responded by moving the Benton County court on August 10 to issue an antisuit TRO in the Reihs transfer action.

On August 14 and 15, 3B filed an amended petition in the Texas action naming FinServ and A.M.Y. as additional plaintiffs. FinServ and A.M.Y. purported to join in 3B's motion to vacate the stay and reinstate the Texas case to the active docket. Mr. Craddock, Mr. Gorman, and their law firm submitted all materials filed with the Texas court as "Counsel for Plaintiffs." CP at 1492, 1517. Both motions were eventually set for an August 24 hearing date.

On August 17, the Benton County court heard Symetra's motion for a TRO. Based on findings that 3B's Texas action was "an attempt to undermine this Court's 2010 Order in this matter," and "an attempt to undermine this Court's jurisdiction over the structured settlement payment," the court issued a TRO enjoining 3B, in relevant part, from taking further action "in Harris County District Court Case No. 2010-41653" and to strike any and all pending motions in that case. CP at 119. The order set a hearing on Symetra's request for a permanent injunction for the afternoon of August 31.

6

3B's chief executive officer was personally served with the TRO on August 20. The following day, Symetra filed an emergency motion asking the Texas court to cancel the impending Texas hearings based on the TRO's dictate that 3B strike pending motions and take no further action in the Texas case. Despite 3B's having been served with the TRO, it did not strike its motions; instead, Mr. Craddock filed a brief in opposition to Symetra's motion on August 22, on behalf of "[a]ll three plaintiffs." CP at 170. While the brief argued that "[n]othing can stop FinServ and A.M.Y. from moving forward in this [Texas] Court" because the TRO did not apply to them, the order of abatement had not been lifted and as of August 22, FinServ and A.M.Y. were not parties to the Texas action. CP at 170-71.

A hearing on Symetra's motion was held before the Texas court on August 23. Mr. Gorman appeared on behalf of 3B and argued that—contrary to this court's decision on appeal—the offset order had been obtained without due process and was invalid. The Texas court reset the hearing on 3B's motions for August 28.

In light of 3B's post August 20 acts and failures to act, Symetra moved in the Benton County court on August 24 for an order finding 3B in contempt. It asked that it be awarded its costs and attorney fees in bringing the contempt motion and in having to participate in the Texas action after service of the TRO. It also asked for a one-time forfeiture of $1,000 against Mr. Gorman. Symetra set the contempt motion to coincide with the permanent injunction hearing set for August 31.

7

Mr. Gorman and 3B were not deterred. 3B still did not strike its motions and Mr. Gorman appeared at the August 28 hearing in the Texas court, where he argued that the stay should be lifted so that 3B could pursue its challenge to the Washington court orders. The Texas court was persuaded to lift the stay for the limited purpose of adding FinServ and A.M.Y. as parties but explained that the suit would otherwise "remain abated, and let's see what happens in Washington on Friday [the August 31 hearing date in Washington], and then we will go from there." CP at 899.

What happened in Washington on Friday was that a lawyer representing FinServ appeared at the time set for the hearings and presented FinServ's notice of removal to federal court, filed earlier in the day. The notice of removal represented that FinServ "is being joined as a party to this lawsuit." CP at 193. While Symetra had filed a motion to add FinServ and A.M.Y. as parties, the court had not yet done so, and the removal was later determined to be defective on multiple grounds.[3] The removal nonetheless derailed

---

[3] The federal court granted Symetra's motion for remand to state court "based on the following:"

> FinServ's non-party status in the underlying litigation; the passage of more than one year since the original litigation which was commenced in approximately 2004 was filed; the non-joinder by other similarly affected entities in FinServ's Notice Of Removal; the failure of FinServ to show that $75,000.00 or more is in controversy; and the apparent ancillary nature of the action which is pending in the Superior Court of Benton County, Washington.

CP at 856-57.

8

Symetra's request for a permanent injunction to replace the expiring TRO and its motion for contempt, which were necessarily stricken.

In granting Symetra's motion to remand the case to state court in early November, the federal court denied Symetra's request for fees and costs, but observed:

> [T]his court takes notice that state court proceedings both in Washington and Texas will allow an ample opportunity for the prevailing party to pursue monetary and equitable relief against FinServ (and possibly others). Under these circumstances, attorney fees and costs are DENIED.

CP at 857.

Within two weeks of the order remanding the Washington case to Benton County, Symetra moved for an extension of the TRO and noted its previously filed motions for November 30. On November 29, 3B requested a continuance. It emphasized that Symetra would not be prejudiced because the insurer had already applied the Reihs payment to its judgment against RSL, and the Texas action—in which 3B, FinServ and A.M.Y. were trying to recover the Reihs payment—had been removed to federal court by Symetra on September 10 and was "on hold" pending 3B's motion for remand. CP at 293. The Benton County court granted 3B's request in part; it entered Symetra's proposed order continuing temporary injunctive relief but continued the motions for a permanent injunction and contempt to December 28.

The hearing proceeded on December 28, and at its conclusion the court entered the permanent injunction requested by Symetra. It took the proposed contempt order under

9

advisement. While 3B filed no brief in opposition to the motion for contempt, its lawyer informed the court during the hearing that it relied for its opposition on the declaration filed with its request for a continuance in November. Unsure that it had reviewed the continuance materials in preparing for the December 28 hearing, the court indicated it wanted to be "fully briefed" before ruling. Report of Proceedings (RP) (Dec. 28, 2012) at 17. Two weeks later, it granted Symetra's motion and entered an order of contempt.

The court's order found 3B and Mr. Gorman in contempt for failing to strike 3B's motions after service of the TRO on August 20 and for appearing and participating in the hearings on August 23 and 28. Based on its findings, the court ordered the following relief:

> 1. 3B is ordered to pay Symetra for its costs and attorneys' fees incurred in bringing this motion for contempt and all costs and attorneys' fees incurred by Symetra in the Harris County, Texas, action between August 20, 2012, when the Court's Temporary Restraining Order was served on 3B, and the date of this Order of Contempt. Symetra has submitted a cost and fee bill showing the amount of these costs and fees is $47,024.50.
>
> 2. Attorney Gorman, as attorney and agent for 3B, is ordered to pay Symetra a one-time forfeiture pursuant to RCW 7.21.030(1)(b) of One Thousand Dollars ($1,000.00).
>
> 3. In order to purge themselves of this contempt charge, 3B and its attorney Gorman must strike all pending motions in the Harris County, Texas, action, and agree not to file any motion or take any other action in said case while an injunction from this Court restraining them from doing so is in effect.

CP at 526. 3B and Mr. Gorman appeal.

## ANALYSIS

3B and Mr. Gorman assign error to the superior court's order holding them in contempt, identifying seven issues. We will first address their challenges to the court's findings of contempt. (Appellant's issues A, C, D, and E). We will then turn to their partially viable challenges to the relief ordered by the court. (Appellant's issues B, F and G).[4]

I. *The court had jurisdiction over Mr. Gorman and its findings of contempt are both sufficient and supported by substantial evidence*

Mr. Gorman argues that because he had not appeared in the Benton County action and was not served with an order to show cause, the court violated his right to due process by entering relief against him. He also argues that his conduct was not sanctionable given "competing duties to his clients." Br. of Appellant at 3. Both Mr. Gorman and 3B contend that substantial evidence does not support the court's contempt findings and that the court erred by granting relief for contempt without finding that they violated the TRO "intentionally."

*Due process as to Mr. Gorman*

Mr. Gorman, a Texas resident, argues that Symetra never served him with process

---

[4] Symetra raises a threshold objection that 3B and Mr. Gorman are raising several arguments for the first time on appeal and asks that we refuse to consider them. Apart from a new challenge to the validity of the purge condition, which we discuss below, we conclude that the appellants' issues were adequately raised in the superior court.

making him a party and that it never obtained an order to show cause, with the result that the court lacked jurisdiction to issue a contempt order against him. He relies on *Burlingame v. Consolidated Mines and Smelting Company, Ltd.*, 106 Wn.2d 328, 722 P.2d 67 (1986).

The *Burlingame* case does not help Mr. Gorman. He focuses on the court's holding in that case that a trial court's order to show cause issued under former RCW 7.20.040 (1881) was adequate notice, and then contrasts that with the contempt proceeding against him, which was initiated, instead, by motion. When Washington's contempt statutes were substantially modified in 1989, a motion procedure was substituted for proceedings on an order to show cause. *See* RCW 7.21.030(1) (court initiates a contempt proceeding on its own motion or the motion of a person aggrieved). The court in *Burlingame* did not hold that an order to show cause is required by due process; it held only that the order to show cause that was statutorily required at the time sufficed under the "minimal notice" that traditionally has satisfied due process requirements for a valid judgment of contempt. *Burlingame*, 106 Wn.2d at 332. The requirements of a valid contempt order are notice and an opportunity to be heard, with the opportunity to be heard being the most significant. "The notice requirement is important only because it protects an individual's right to be heard." *Id.* (citing *Hovey v. Elliott*, 167 U.S. 409, 414-15, 17 S. Ct. 841, 42 L. Ed. 215 (1897)). *Burlingame* requires only

that we consider whether the motion procedure followed below provided notice sufficient to protect Mr. Gorman's right to be heard.

Symetra moved the court to "enter an order finding 3B and its agent, attorney Gorman, in contempt." CP at 156. There can be no question that Mr. Gorman was aware of Symetra's motion. During the hearing in Texas on August 23, Symetra's lawyer mentioned that his client viewed 3B as being in contempt of the TRO, to which Mr. Gorman responded, "Contempt, I just heard contempt. You know, we want to be in Texas. We want a forum that's going to hear us." CP at 511. During the August 28 hearing in Texas, Mr. Gorman told the court that "as forewarned the other day . . . [Symetra has] now filed a motion for contempt seeking to hold me personally in contempt of court up in Washington for pursuing this action in a Texas court." CP at 485. A certificate of service establishes service by mail of the motion for contempt and proposed order on Mr. Gorman at least as early as November 19, 2012. In granting the continuance requested by 3B on November 30, the Benton County court created its order—which clearly indicated the time and place of the December 28 hearing—by modifying Symetra's proposed "Order of Contempt Against RSL-3B-IL, Ltd. and Attorney Gorman." CP at 310-12. The order was signed "approved as to form" by 3B's

13

lawyer. The notice provided was more than sufficient to protect Mr. Gorman's right to be heard.[5]

*Substantial evidence supports the findings of contempt*

The court's contempt order included the following findings of violations of the TRO after it was served on 3B, and thereby contempt: that 3B and Mr. Gorman continued to pursue the Texas action (finding 1), that 3B failed to strike the motions in that lawsuit that were pending at the time of the TRO (finding 2), that 3B opposed Symetra's motion to extend the time for hearing those motions (finding 2), and that Mr. Gorman presented argument at the August 23 and August 28 hearings (finding 2).

---

[5] For the first time in the reply brief, Mr. Gorman recasts his argument as one challenging a second requirement of due process: an alleged lack of personal jurisdiction over him for lack of minimum contacts with the State. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950) (due process requires that a defendant be given notice and be subject to the personal jurisdiction of the court.) Under RAP 10.3(c), "a contention presented for the first time in the reply brief will not receive consideration on appeal." *Fosbre v. State*, 70 Wn.2d 578, 583, 424 P.2d 901 (1967). This rule applies even to challenges regarding personal jurisdiction. *See, e.g., State ex rel. Pub. Disclosure Comm'n v. Permanent Offense*, 136 Wn. App. 277, 294, 150 P.3d 568 (2006). Even so, under our long-arm statute, RCW 4.28.185, Washington courts may assert jurisdiction over nonresident individuals to the extent permitted by the due process clause of the United States Constitution, except as limited by the terms of the statute. *Deutsch v. West Coast Mach. Co.*, 80 Wn.2d 707, 711, 497 P.2d 1311 (1972). Mr. Gorman had been admitted pro hac vice by this court in 2011 and appeared in Spokane to argue the first appeal. We have no doubt that Mr. Gorman's appearance in Washington in a legal proceeding whose outcome he then collaterally attacks elsewhere, in contempt of court, is a contact of such character that maintenance of the contempt action does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945).

The United States Supreme Court decided 125 years ago that the court of one state may enjoin parties to a case before it from engaging in vexatious litigation in another state for the purpose of evading the rulings of the first court. *Cole v. Cunningham*, 133 U.S. 107, 111, 10 S. Ct. 269, 33 L. Ed. 538 (1890). Such injunctions may not control the second court's actions regarding the litigation in that court, but they are effective against the parties, with sanctions generally administered only by the court issuing the injunction. *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 236, 118 S. Ct. 657, 139 L. Ed. 2d 580 (1998) (citing, *e.g.*, *James v. Grand Trunk Western R. Co.*, 14 Ill. 2d 356, 372, 152 N.E.2d 858 (1958); *Stiller v. Hardman*, 324 F.2d 626, 628 (2d Cir. 1963)).

In this case, the Benton County court issued the TRO on August 17 and it was served on 3B on August 20. The TRO ordered 3B "to strike any and all pending motions in [Harris County District Court Case No. 2010-41653]." CP at 119. 3B had pending motions in the case at the time. It did not strike them.

The TRO enjoined 3B "from taking any further action" in the Texas case. *Id.* Two days after being served with the TRO, on August 22, 3B filed a response in the Texas court opposing Symetra's emergency motion.

A temporary restraining order is binding upon "the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." CR 65(d). Days after service of the TRO on 3B, Mr. Gorman

15

appeared in the Texas court on August 23 and 28 to advocate on behalf of 3B and in opposition to Symetra. The existence of the Washington TRO was a subject matter of his argument on both occasions.

While chapter 7.21 RCW provides that a court may find a person in contempt *and* impose a coercive sanction only upon "[a] person [who] has failed . . . to perform an act that is yet within the person's power to perform," RCW 7.21.030(2), a court may find a person in contempt whether or not it is possible to coerce future compliance. Any "intentional . . . [d]isobedience of any lawful judgment, decree, order or process of the court" is a contempt of court as defined by RCW 7.21.010(1)(b). RCW 7.21.030(3) allows the court to order a contemnor to pay losses suffered as a result of the contempt and costs incurred in the contempt proceedings for any "person found in contempt of court" without regard to whether it is possible to craft a coercive sanction. See *State ex rel. Chard v. Androw*, 171 Wash. 178, 17 P.2d 874 (1933) (affirming judgment for $3,000 loss imposed on contemnor for violating court order; no coercive sanction imposed due to contemnor's inability to perform).[6]

A trial court's finding of contempt will not be disturbed on appeal as long as it is supported by substantial evidence in the record. *In re Marriage of Farr*, 87 Wn. App.

---

[6] While not an issue in this case, punitive sanctions can be imposed for a past contempt of court through a criminal contempt proceeding whether or not it is continuing. *See* RCW 7.21.050. A completed intentional act of a type identified by RCW 7.21.010 falls within the definition of "contempt of court."

177, 184, 940 P.2d 679 (1997); *Ramstead v. Hauge*, 73 Wn.2d 162, 167, 437 P.2d 402 (1968). Where, as in this case, "the superior court bases its contempt finding on a court order, 'the order must be strictly construed in favor of the contemnor,' and '[t]he facts found must constitute a plain violation of the order.'" *Dep't of Ecology v. Tiger Oil Corp.*, 166 Wn. App. 720, 768, 271 P.3d 331 (2012) (emphasis omitted) (citations omitted).

The record unquestionably supports the violations found by the court. Since they occurred after service on 3B of the TRO, they would appear to support the court's findings of contempt. But 3B and Mr. Gorman argue that their literal violations were not contumacious for several reasons.

First, they emphasize that it was Symetra's emergency motion in Texas that precipitated the need for 3B's opposition. But if 3B had stricken its motions as ordered, Symetra would have had no need to file its emergency motion. Moreover, the relief that Symetra was seeking through its emergency motion was entirely consistent with the Benton County court's TRO. Consistent with the TRO, 3B should not have opposed it.

3B and Mr. Gorman argue that the two hearings at which Mr. Gorman appeared while the TRO was in effect were set by the Harris County court. Again, if 3B had stricken its motions as required by the TRO, the hearings would presumably have been stricken by the court. If they weren't, then consistent with the TRO, 3B should have done no more than explain to the court why it could not participate.

17

3B and Mr. Gorman argue that FinServ and A.M.Y. were interested parties and would have been free to take action in the Texas proceeding. But until FinServ and A.M.Y. were joined—which was not acted upon by the court until it vacated the abatement order for that limited purpose on August 28—only 3B was a party to the proceeding. And even if FinServ and A.M.Y. could be viewed as parties to the proceeding before the limited lifting of the abatement order on August 28, that does not excuse 3B's own participation in violation of the TRO or Mr. Gorman's appearance on 3B's behalf.

Finally, 3B argues that it acted on its lawyer's advice and Mr. Gorman argues that he was duty bound to advance the wishes of his client. Neither rationale excuses them from responsibility for contempt. Acting on advice of counsel in refusing to obey a TRO is not a defense to a civil contempt proceeding. *Ramstead*, 73 Wn.2d at 166; *Rekhi v. Olason*, 28 Wn. App. 751, 757, 626 P.2d 513 (1981). Because the TRO did not require Mr. Gorman to violate any privilege, the limited defense recognized in assertion of privilege cases does not apply. *Cf. Dike v. Dike*, 75 Wn.2d 1, 5-9, 448 P.2d 490 (1968) (where lawyer is ordered by the court to reveal privileged information and is held in contempt for refusal to do so, the proper procedure is to stay all sanctions for contempt pending appellate review). While Mr. Gorman argues that he could not take action against his client's wishes, he had the options of encouraging his client to comply with the TRO or, if 3B could not be persuaded to comply, then of withdrawing from the

18

representation rather than commit contempt. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 3.04(d) ("A lawyer shall not . . . knowingly disobey, or advise the client to disobey . . . a ruling by a tribunal except for an open refusal based either on an assertion that no valid obligation exists or on the client's willingness to accept any sanctions arising from such disobedience") and 1.15(b)(4) (providing that a lawyer may withdraw from representing a client who "insists upon pursuing an objective that the lawyer considers repugnant or imprudent or with which the lawyer has fundamental disagreement").

Appellants cite *State ex rel. Nicomen Boom Co. v. North Shore Boom & Driving Co.*, 55 Wash. 1, 13, 103 P. 426 (1909), *modified on reh'g*, 107 P. 196 (1910) (Mount, J., dissenting) for the proposition that "[t]here is nothing in the [contempt] statute to indicate that it was intended to include one who in good faith advises the wrong." But that case dealt with a lawyer, Mr. Abel, who did not himself violate the court's order as Mr. Gorman did here. *Id.* at 14. Mr. Abel "advised the officers to do the things complained of," but "did not directly participate therein himself." *Id.* at 17. As observed by the majority opinion, "An offending attorney *would be liable . . . for a willful disregard of the orders of the court*, but it would require a forced construction of the statute to make him subject to civil liability because of his advice honestly given." *Id.* at 14 (emphasis added). Mr. Gorman was not found in contempt for his advice, but for his actions.

19

Appellants are correct that the TRO expired on August 31. CR 65(b) (temporary restraining orders expire within 14 days unless extended). But the acts of contempt found by the court all occurred on or before August 31. The findings of contempt are supported by substantial evidence of violations of the court's order during the two weeks it was in effect.

### No "finding" of intentional conduct was required

The superior court's contempt order did not include an explicit finding that 3B's and Mr. Gorman's violations of the TRO were intentional. Relying on the statement in *Holiday v. City of Moses Lake*, 157 Wn. App. 347, 355, 236 P.3d 981 (2010) that "a finding that a violation of a previous court order was intentional is required for a finding of contempt," 3B and Mr. Gorman argue that absent an explicit finding of intentional conduct, the trial court's order is insufficient. As further support, they cite *In re Estates of Smaldino*, 151 Wn. App 356, 365, 212 P.3d 579 (2009), in which a lawyer was found in contempt for violating the terms of a TRO prohibiting his client from transferring her real property, after he caused her to grant him a deed of trust to secure payment of his legal fees and then recorded it. On appeal, the lawyer argued that the court's finding that he intentionally disobeyed the TRO was contradicted by its finding that he had chosen not to read the TRO. *Id.* at 362. The court held that knowledge could be imputed. It also held that because the lawyer's acquisition of a security interest in the property "was an intentional act," his act in disobedience of the order was intentional. *Id.* at 365.

20

The two decisions hold only that an individual must act intentionally to be found in contempt of court. Under RCW 7.21.010(1)(b), "contempt of court" is defined, in relevant part, as "*intentional* . . . [d]isobedience of any lawful judgment, decree, order, or process of the court." (Emphasis added.) But given that definition, the Benton County court's finding of contempt reflects an implicit finding that 3B's and Mr. Gorman's acts and omissions *were* intentional.

When the Washington legislature intends to require that an explicit finding must be made for a court to act, it says so. *See, e.g.*, RCW 13.34.155 ("dependency court . . . must make a written finding" that parenting plan is in a child's best interest); RCW 13.40.193 (juvenile found to have been unlawfully in possession of a firearm must receive a disposition that includes program participation "unless the court makes a written finding . . . that participation . . . would not be appropriate"); RCW 4.84.185 (court may award expenses of suit "upon written findings by the judge that the action . . . was frivolous"). Nothing in chapter 7.21 RCW requires that the court make a written finding of intentional conduct.

All of 3B's and Mr. Gorman's acts and omissions identified by the contempt order as violations were supported by evidence that established their inherently intentional character. The court was not required to explicitly find that they were intentional.

II. *The relief ordered for the contempt was largely although not entirely appropriate, given the civil character of the contempt proceeding*

Having determined that the trial court properly found 3B and Mr. Gorman in contempt, we turn to the propriety of the relief awarded in what was initiated and conducted as a civil contempt proceeding.[7] The relief awarded consisted of attorney fees and costs incurred in the contempt proceeding; attorney fees and costs incurred in the Texas proceeding; and the $1,000 onetime sanction against Mr. Gorman.

*Costs incurred in the contempt proceeding*

RCW 7.21.030(3) provides in relevant part that in addition to imposing remedial sanctions authorized elsewhere in the statute, "[t]he court may . . . order a person found in contempt of court to pay a party for . . . any costs incurred in connection with the contempt proceeding, including reasonable attorney's fees." 3B and Mr. Gorman do not contend that Symetra was not entitled to costs, including attorney fees; they argue that Symetra was awarded costs that were not incurred in the contempt proceeding. They specifically complain of

---

[7] 3B and Mr. Gorman argue that some of the relief awarded was in the nature of punishment, making the proceeding below a criminal contempt proceeding; from that, they argue that because it was not conducted as a criminal contempt proceeding, all of the relief ordered by the court fails. The proceeding was initiated and conducted as a civil contempt proceeding. To the extent that relief ordered by the court was improper, it will be reversed. We reject the appellants' effort to have us analyze the proceeding as something it was not.

22

> [t]he costs and fees awarded for the removal and remand filings in both the Texas and Washington federal courts, the filings related to RSL-3B's Motion for Vacate the Abatement and the Motion to Deposit, and responding to RSL-3B's Motion to Transfer to [Texas federal district court] Judge Lake's Court.

Br. of Appellant at 27.

Symetra responds that fees for the Texas proceeding were recoverable not as costs, but as losses suffered as a result of the contempt. Losses are separately recoverable and are addressed below.

As to costs, Symetra submitted declarations documenting $14,890.50 in attorney fees incurred in the Washington action between August 18, the day after the TRO was obtained, and December 12, 2012, including those incurred while the action was temporarily in federal court. The declarations did not segregate fees for services directly related to the motion for contempt from other fees incurred during that time frame.

We review a trial court's award of attorney fees for an abuse of discretion. *Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 519, 910 P.2d 462 (1996). If the record proves inadequate for us to review the fee award, we must remand for further proceedings. *Just Dirt, Inc. v. Knight Excavating, Inc.*, 138 Wn. App. 409, 157 P.3d 431 (2007).

We conclude that all of the fees for services performed in obtaining a remand of the case from the federal court were properly awarded. Symetra was a victim, not the cause, of the improper removal to federal court. A clear objective of the remand was to

get the proceeding back before the Benton County court so that Symetra's earlier-filed motion for contempt could be heard. Obtaining the remand was necessary and appropriate to that end.

Other fees included in the $14,890.50 figure were not incurred in connection with the contempt proceeding, however. Just as Symetra's fees incurred in obtaining the TRO are not recoverable under RCW 7.21.030(3), its fees incurred in obtaining the extension of the TRO and the permanent injunction are not recoverable. Nor can Symetra recover its fees incurred in moving to add FinServ and A.M.Y. as parties to the Benton County action.

Because the declarations submitted are inadequate to segregate fees that were recoverable as costs, the case must be remanded for further submissions by Symetra and a second review by the court.

*Loss suffered as a result of the contempt*

As to loss, RCW 7.21.030(3) provides in relevant part that in addition to other relief available in the contempt proceeding, "[t]he court may . . . order a person found in contempt of court to pay a party for any losses suffered by the party as a result of the contempt."

The seminal decision in *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441, 31 S. Ct. 492, 55 L. Ed. 797 (1911) observed that "[c]ontempts are neither wholly civil nor altogether criminal," and that in either event, there is "an allegation that in

24

contempt of court the defendant has disobeyed the order, and a prayer that he be attached

and punished therefor." As a result, a defendant may be "punished" even in a civil

contempt proceeding if the purpose is to compensate the complainant:

> It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases. If it is for civil contempt *the punishment is remedial, and for the benefit of the complainant.* But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial as well as punitive, *and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant*, but also in committing the defendant to prison.

*Id.* at 441-42 (emphasis added).

In *United States v. United Mine Workers of America*, the United States Supreme

Court again recognized that there are two types of remedial sanctions imposed in civil

contempt proceedings, holding that "[j]udicial sanctions in civil contempt proceedings

may . . . be employed for either or both of two purposes; to coerce the defendant into

compliance with the court's order, and to compensate the complainant for losses

sustained." 330 U.S. 258, 303-04, 67 S. Ct. 677, 91 L. Ed. 884 (1947) (citing *Gompers*,

221 U.S. at 448-49).

> Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.
>
> But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy,

25

and the probable effectiveness of any suggested sanction in bringing about the result desired.

*Id.* (footnotes omitted).

In his treatise on remedies, Professor Dobbs writes:

> The Supreme Court has long recognized that one appropriate kind of sanction for civil contempt is remedial rather than coercive. That is, the sanction provides the plaintiff with a substitute for the defendant's obedience without compelling that obedience itself. The most straightforward version of the remedial sanction is the compensatory fine, paid to the plaintiff as compensation. If the fine is to be justified because it is remedial, courts have said that it must be based on evidence, either of the plaintiff's loss or the defendant's gains.

1 DAN B. DOBBS, DOBBS LAW OF REMEDIES 194 (2d ed. 1993) (footnotes omitted).

Federal courts and a clear majority of state courts allow compensatory damages or fines payable to the injured party as relief in a civil contempt proceeding. Annotation, *Right of Injured Party to Award of Compensatory Damages or Fine in Contempt Proceedings*, 85 A.L.R.3D 895, § 2[a] (1978). In *State ex rel. Lemon v. Coffin*, 52 Wn.2d 894, 896, 332 P.2d 1096 (1958), the Washington Supreme Court held that the purpose of the provision for recovery of loss under former RCW 7.20.100 (1880)[8] was "to provide

---

[8] Former RCW 7.20.100 (1881) provided:

If any loss or injury to a party in an action, suit or proceeding prejudicial to his rights therein, have been caused by the contempt, the court or judicial officer, in addition to the punishment imposed for the contempt, may give judgment that the party aggrieved recover of the defendant a sum of money sufficient to indemnify him, and to satisfy his costs and disbursements.

complete relief in the original action and to eliminate the necessity of a second suit to recover the expense caused by such contempt."

Compensatory fines have been imposed in Washington contempt proceedings to address many types of loss and damage caused by a party's contumacious acts. *E.g.*, *Premium Distrib. Co., Inc. v. Int'l Bhd. of Teamsters*, 35 Wn. App. 36, 39, 664 P.2d 1306 (1983) (affirming award of $15,000 for property damage and business loss caused by violations of an injunction); *Ramstead*, 73 Wn.2d at 167 (affirming award of expenses incurred where defendant prevented moving of home in violation of TRO); *McFerren v. McFerren*, 55 Wn.2d 471, 476, 348 P.2d 222 (1960) (affirming award of repair expense and loss of use for husband's violation of divorce decree); *Chard*, 171 Wash. at 180 (affirming award of damages for lost property value for purchaser's violation of judicial order of sale); *Nicomen*, 55 Wash. at 11, (plaintiff was entitled to be awarded damages for lost profits attributable to interference with its booming privileges in violation of judgment).

Where a party violates an antisuit injunction, the most obvious "loss suffered . . . as a result of the contempt" is the cost of answering to proceedings in the foreign court that would not have occurred had the injunction been complied with. Symetra submitted declarations documenting $32,134 in attorney fees incurred in the Texas action between August 18 and December 12, 2012. 3B and Mr. Gorman argue that even if some fees in the Texas proceeding are recoverable, they ceased to be recoverable after the TRO

expired on August 31 or, at the latest, after Symetra removed the Texas action to federal court on September 10. They also argue that Symetra cannot claim to have suffered loss from its actions in the Texas litigation since FinServ and A.M.Y., who were not subject to injunction, were asserting their own challenge to Symetra's offset of the Reihs transfer payment.

3B's failure and refusal to comply with the TRO and strike all of its motions in the Texas action produced the fees incurred by Symetra in the post August 31 and post September 10 Texas proceedings against 3B, both state and federal. If the losses were incurred over a matter of months, it was because Symetra's ability to obtain relief was delayed through no fault of its own. In *McFerrin*, the complainant was awarded an amount for lost use of a home over a number of months even though the lost use was only an indirect result of her husband's failure to make court ordered repairs to her home. In *Chard*, the complainant was awarded damages for a decline in value of its property following the date on which a purchaser failed to honor the judicial order of sale of the complainant's home. In both cases, damages were not limited according to the time frame within which the contemnor had been ordered to act. They were based on the loss that, at the time of hearing, the complainant could demonstrate had resulted from the contempt.

Although the August 31 and September 10 dates are significant for other purposes,[9] they are artificial cutoff points for purposes of determining the amount of loss Symetra had suffered as a result of the contempt by the time of its first opportunity to have its motion heard.

Symetra's expenses incurred litigating with FinServ and A.M.Y. after August 28 are another matter. The preexisting perfected security interests that FinServ and A.M.Y. claim to have in the Reihs payment were not addressed in the Benton County transfer action. It appears that Symetra was unaware of the existence of any competing security interests. If and to the extent that FinServ and A.M.Y. held viable security interests, or at least interests they believed in good faith were viable, then those two entities were entitled to assert their legal rights, and 3B's August 2012 acts of contempt do not provide a reasonable basis for imposing Symetra's cost of fighting that priority issue with FinServ and A.M.Y on 3B.[10]

---

[9] For example, the superior court could not find acts or omissions enjoined by the terms of the TRO but that took place after August 31 to be contempt. It did not. Under the United States Supreme Court's decision in *Donovan v. City of Dallas*, 377 U.S. 408, 84 S. Ct. 1579, 12 L. Ed. 2d 409 (1964), the superior court could not exercise authority over 3B's conduct in the federal case in Texas following removal. Here, we are not dealing with that limitation; we are determining the losses that resulted from the August acts of contempt.

[10] To be clear, to the extent *3B* was asserting FinServ's and A.M.Y.'s priority, Symetra's legal expense in responding should be recoverable from 3B as loss. Insofar as 3B asserts an interest in having its creditors' security interests recognized, it should have asserted that interest in the 2010 proceedings in Benton County. Res judicata, or claim

Symetra should have segregated the attorney fees incurred in the Texas action against 3B, offensively or defensively, from the attorney fees incurred in that action, against FinServ and A.M.Y, offensively or defensively. *Cf. Manna Funding, LLC v. Kittitas County*, 173 Wn. App. 879, 295 P.3d 1197, *review denied*, 178 Wn.2d 1007 (2013) (requiring segregation of fees between claims where fees are recoverable only as to some claims); *Seattle-First Nat. Bank v. Washington Ins. Guar. Ass'n.*, 94 Wn. App. 744, 972 P.2d 1282 (1999) (requiring a reasonable allocation of fees among multiple clients, where fees were recoverable only by some clients). To the extent that 3B, FinServ, and A.M.Y. joined in the same submissions and appeared through the same counsel, the superior court must arrive at some reasonable basis for allocating fees. In the *Seattle-First* case, the court suggested looking to the law firm's fee agreement with its clients as a basis for allocation. *Id.* at 763. Another approach would be for Symetra to determine, through discovery, what percentage of the cost of representation in the Texas action was being borne by each of the three entities. The allocation need not be precise, but it must be examined and be reasonable. *Id.*

---

preclusion, prohibits the relitigation not only of claims and issues that were litigated but also those that could have been litigated in a prior action. *Pederson v. Potter*, 103 Wn. App. 62, 67, 11 P.3d 833 (2000).

*The $1,000 onetime sanction against Mr. Gorman*

The final relief awarded by the court was its $1,000 onetime forfeiture against Mr.

Gorman. The provision describing the forfeiture and the clause describing action

required to purge the contempt provide in their entirety:

> 2. Attorney Gorman, as attorney and agent for 3B, is ordered to pay Symetra a one-time forfeiture pursuant to RCW 7.21.030(1)(b) of One Thousand Dollars ($1,000.00).[11]
>
> 3. In order to purge themselves of this contempt charge, 3B and its attorney Gorman must strike all pending motions in the Harris County, Texas, action, and agree not to file any motion or take any other action in said case while an injunction from this Court restraining them from doing so is in effect.

CP at 526.

"An order of remedial civil contempt must contain a purge clause under which a

contemnor has the ability to avoid a finding of contempt and/or incarceration for non-

compliance." *State ex rel. Shafer v. Bloomer*, 94 Wn. App. 246, 253, 973 P.2d 1062

(1999). Because a sanction "loses its coercive character and becomes punitive where the

contemnor cannot purge the contempt," there "must be a showing that the contemnor has

the means to comply" with the purge condition. *Britannia Holdings Ltd. v. Greer*, 127

---

[11] The forfeiture provision (language proposed by Symetra) would more clearly have been a remedial coercive sanction had it made clear, as provided by RCW 7.21.030(1)(b), that Mr. Gorman had a day within which to comply with the purge condition and thereby avoid any forfeiture. Because the order describes the forfeiture as "pursuant to RCW 7.21.030(1)(b)," we construe the one-day purge period as incorporated by reference.

31

Wn. App. 926, 933, 113 P.3d 1041 (2005) (footnote omitted). "Whether a purge

condition exceeded the court's authority or violated a contemnor's due process rights . . .

[are] question[s] of law, which [are] reviewed de novo." *In re M.B.*, 101 Wn App. 425,

454, 3 P.3d 780 (2000); *In re Silva*, 166 Wn.2d 133, 140, 206 P.3d 1240 (2009).

Mr. Gorman first challenges the purge condition as exceeding the scope of the

original order, something he claims a civil contempt sanction can never do. He relies on

the statement in *State v. Buckley*, 83 Wn. App. 707, 711, 924 P.2d 40 (1996) that a

sanction is punitive "if it is imposed to punish a past contempt of court . . . and does not

afford the defendant an opportunity to purge the contempt *by performing the acts*

*required in the original order*." (Emphasis added) (footnote omitted). He asserts that the

contempt order in this case could, at most, have required him to "undo" acts or omissions

occurring between August 17 and 31, while the TRO was in effect—an impossibility in

this case. The argument was addressed and rejected in *M.B.*, in which the court rejected

an appellant's attempt to "seize upon" the same language in *Buckley* to argue that a court

may not impose a purge condition that was not required by the court order that was

violated. *M.B.* holds that a trial court has inherent authority to impose purge conditions

beyond the four corners of the violated order, as long as the condition serves remedial

aims and the condition is "reasonably related to the cause or nature of the contempt."

*M.B.*, 101 Wn. App. at 450 (emphasis omitted) (citing *In re Marriage of Larson*, 165

Wis. 2d 679, 478 N.W.2d 18 (1992)). The purge condition here satisfies those criteria.

3B and Mr. Gorman next contend that the trial court erred in failing to make a threshold finding that they were able to comply with the purge condition at the time the contempt order issued. They argue for the first time on appeal that they were *not* able to comply because the Texas state court action had been removed to federal court by the time of the contempt hearing, and after a case is removed to federal court, "the state court loses jurisdiction to proceed further, and all subsequent proceedings therein are void." *Iowa Cent. Ry. Co. v. Bacon*, 236 U.S. 305, 310, 35 S. Ct. 357, 59 L. Ed. 591 (1915).

Alternatively, if the reference to "the Harris County, Texas, action" in the purge condition means or includes the federal action (as Symetra contends), then 3B and Mr. Gorman reply that the court could not impose such a purge condition consistent with *Donovan v. City of Dallas*, 377 U.S. 408, 84 S. Ct. 1579, 12 L. Ed. 2d 409 (1964).

"In the context of civil contempt, the law presumes that one is capable of performing those actions required by the court." *In re Pers. Restraint of King*, 110 Wn.2d 793, 804, 756 P.2d 1303 (1988). "Thus, inability to comply is an affirmative defense. A contemnor has both the burden of production on ability to comply . . . as well as the burden of persuasion." *Id.*; *Moreman v. Butcher*, 126 Wn.2d 36, 40, 891 P.2d 725 (1995). "The contemnor must offer evidence as to his inability to comply and the evidence must be of a kind the court finds credible." *King*, 110 Wn.2d at 804.

3B's and Mr. Gorman's argument that they were unable to comply with the purge condition comes too late. As pointed out by Symetra, the argument was not made in the

33

superior court. While 3B represents that it *did* make the argument or, alternatively, that its inability to comply "only ripened into a real controversy once the trial court signed the Contempt Order," Reply Br. at 18, neither contention is supported by the record.

The record reveals that Symetra's proposed contempt order, with its proposed purge condition, was served on 3B and Mr. Gorman at least as early as November 19. Moreover, when the superior court granted a continuance on November 30, it adapted the proposed contempt order to grant the continuance. As adapted, the order of continuance (including the proposed purge condition) is signed "approved as to form" by 3B's Washington lawyer. Since 3B and Mr. Gorman had ample advance notice of the proposed purge condition, any inability to comply with it was an affirmative defense that they needed to raise before the contempt order was entered, not after.

The record also belies 3B's and Mr. Gorman's contention that they raised the issue of inability to comply with the purge condition during or before the hearing on the motion for contempt. The only briefing they submitted—3B's motion for a continuance—was filed at a time when 3B had moved to remand the Texas case to state court. Accordingly, the briefing contemplated future state litigation, not federal litigation. On the merits of the motion for contempt, 3B's continuance briefing argued only that (1) the Benton County court issued the TRO after 3B, FinServ and A.M.Y. filed their motion to vacate the Texas stay and their first amended petition, (2) the TRO did not apply to FinServ or A.M.Y., and (3) Symetra's application for a permanent injunction

34

was not heard because FinServ removed the Washington action to federal court. The only reference in the briefing to the fact that the Texas action had been removed to federal court was in the context of explaining why Symetra would not be prejudiced by the requested continuance.

Nor did 3B's lawyer argue inability to comply with the purge condition at oral argument of the motion for contempt. Instead, he argued that there was no intentional violation of the TRO because (1) the lawyer representing 3B had also been representing FinServ and A.M.Y., (2) the abatement order remained in place in relevant respects during the 14 days the TRO was in effect, (3) the "violations" complained of predated the TRO, and (4) appearing at a hearing that had already been set "on behalf of FinServ and A.M.Y." was not contumacious. RP (Dec. 28, 2012) at 6-7. The one reference to removal of the Texas action to federal court was not in connection with any inability to perform the purge condition but in the context, instead, of arguing that the Benton County court no longer had jurisdiction to deal with the parties' disputes because Symetra had moved the Texas action to federal court "because they wanted it there."[12] *Id.* at 7.

---

[12] 3B and Mr. Gorman also cite to portions of the record that postdate the order of contempt, including a motion for new trial and reconsideration filed on January 23, 2013, in which they challenged the validity of the purge clause for the first time. CP at 692. The reconsideration motion was summarily denied. CP at 1753. Since they have not assigned error or presented any argument or authority regarding any mishandling of their post order submissions, we will not consider them. RAP 10.3(a)(4), (6).

RAP 2.5(a) "reflects a policy of encouraging the efficient use of judicial resources and refusing to sanction a party's failure to point out an error that the trial court, if given the opportunity, might have been able to correct to avoid an appeal." *In re Guardianship of Cornelius*, 181 Wn. App. 513, 533, 326 P.3d 718 (2014). We follow the general policy provided by the rule of refusing to entertain this issue, which is raised for the first time on appeal.

### Attorney fees on appeal

Both parties request attorney fees on appeal. 3B and Mr. Gorman seek fees and ask the court to deny Symetra's request for fees on the grounds that "Symetra sought and utilized the trial courts [sic] jurisdiction to obtain the contempt order in derogation of Washington law." Br. of Appellant at 29-30. They fail to show entitlement based on a contract, statute, or recognized ground of equity. *Hsu Ying Li v. Tang*, 87 Wn.2d 796, 797-98, 557 P.2d 342 (1976).

Symetra seeks its fees on appeal under RAP 18.1(a) and RCW 7.21.030(3). RAP 18.1 permits recovery of reasonable attorney fees or expenses on review if applicable law grants that right. RCW 7.21.030(3) permits an award of attorney fees incurred by a party in defending the appeal of a contempt order. *R.A. Hanson Co. v. Magnuson*, 79 Wn. App. 497, 505, 903 P.2d 496 (1995). Symetra is awarded its fees and costs on appeal subject to compliance with RAP 18.1(d).

36

The superior court's award of costs and loss is reversed and remanded for further proceedings consistent with this opinion. The order of contempt is otherwise affirmed.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, J.