**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| KITSAP COUNTY, a political subdivision of the State of Washington, | No. 53878-4-II |
| Respondent, | |
| v. | |
| KITSAP RIFLE AND REVOLVER CLUB, a not-for-profit corporation registered in the State of Washington, and JOHN DOES and JANE ROES I-XX, inclusive, | UNPUBLISHED OPINION |
| Appellant. | |
| and | |
| IN THE MATTER OF NUISANCE AND UNPERMITTED CONDITIONS LOCATED AT One 72-acre parcel identified by Kitsap County Tax Parcel ID No. 362501-4-002-1006 with street address 4900 Seabeck Highway NW, Bremerton, Washington. | |

MELNICK, J. — The Kitsap Rifle and Revolver Club (Club) appeals the trial court's order denying its motion to terminate a sanction for contempt of court. The Club argues that the contempt sanction must be terminated because it is financially unable to perform the sanction's purge condition. The trial court did not abuse its discretion in determining that the Club had the financial ability to perform the contempt sanction's purge condition. We affirm.

FACTS[1]

I.    BACKGROUND

The Club is a nonprofit corporation that has operated a shooting range in Bremerton since the 1920s.  In 1993, the Club's use of the shooting range was a lawfully established nonconforming use.

In the 1990s, the Club began developing the property on which its shooting range was located.  It included clearing and excavating wooded or semi-wooded areas, removing vegetation, replacing a water course that ran through a wetland buffer with two 475-foot culverts, and excavating and moving soil.  The Club did not obtain permits for any of this work.

In 2011, Kitsap County filed a complaint for an injunction, declaratory judgment, and nuisance abatement against the Club.  The County argued that the Club's development activities were unlawful because it lacked the necessary permits.

After a bench trial, the trial court concluded that the Club's unpermitted use of the property was unlawful and terminated the nonconforming use of the property as a shooting range.  The trial court issued a permanent injunction prohibiting the Club from operating a shooting range until the County issued conditional use permits for the Club's property.[2]  The court also authorized issuance of a warrant of abatement, the details of which would be determined at a later hearing.

---

[1] These facts are derived from *Kitsap County v. Kitsap Rifle* (*Kitsap Rifle* III), No. 50011-6-II, (Wash. Ct. App. Jan. 30, 2018) (unpublished), https://www.courts.wa.gov.opinions/, and *Kitsap County v. Kitsap Rifle & Revolver Club* (*Kitsap Rifle* I), 184 Wn. App. 252, 261, 337 P.3d 238 (2014), as well as the record submitted.

[2] The court also issued a permanent injunction prohibiting other activities at the shooting range.

II.    *KITSAP RIFLE* I (2014)

The Club appealed the trial court's ruling. We stated that "there is no dispute that the Club's unpermitted development work on the property constituted unlawful uses." *Kitsap County v. Kitsap Rifle & Revolver Club* (*Kitsap Rifle* I), 184 Wn. App. 252, 275, 337 P.3d 238 (2014). We affirmed the trial court's ruling that the Club's development work violated County land use permitting requirements. However, we concluded that termination of the nonconforming use was not the proper remedy. As a result, we vacated the trial court's injunction prohibiting the Club from operating as a shooting range and remanded for the trial court to determine the proper remedies for the Club's permitting violations under the Kitsap County Code.

III.    REMAND FROM *KITSAP RIFLE* I

On remand, the trial court issued an order supplementing judgment on remand. The order stated in pertinent part that the Club had to apply for and obtain site development activity permitting (SDAP) within 180 days of the order, i.e. August 3. The order also ordered that a warrant of abatement could be authorized if the Club's participation in the permitting process did not cure the code violations and permitting deficiencies.

The trial court entered the order on February 5 after the 180-day period ended and the Club had not submitted an SDAP application.

IV.    MOTION FOR CONTEMPT

On August 18, the County filed a motion for contempt, requesting that the court prohibit the Club from operating a shooting range until the Club submitted an application for an SDAP.

The trial court held a hearing on August 26. The Club argued that it was unable to comply with the court's order because of the expense. The court declined to find the Club in contempt at

that time and provided an additional 90 days for the Club to file the required SDAP application. The court scheduled a second hearing for December 2.

At the second contempt hearing, the County argued that the Club had not established an inability to pay the expenses of the permit process.

The Club had submitted a declaration of Marcus Carter, the Club's executive officer, about the cost of completing the application and the Club's end-of-month operating account balance in 2016. But the Club failed to present corroborating information about its financial situation, including tax returns, statements of assets and liabilities, or bank statements. The court noted that the Club presented minimal evidence of inability to pay and therefore did not meet its burden of proof. The court concluded that "the lack of detailed evidence" was fatal to the Club's claim that it was unable to comply with the court's order. *Kitsap County v. Kitsap Rifle* (*Kitsap Rifle* III), No. 50011-6-II, slip op. at 16 (Wash. Ct. App. Jan. 30, 2018) (unpublished), https://www.courts.wa.gov.opinions/.

The trial court granted the County's motion for contempt and entered an order, along with findings of fact and conclusions of law. The court concluded that an appropriate remedy for the Club's contempt was an injunction prohibiting the Club from operating a shooting facility until it obtained permitting. On that basis, the court enjoined the Club from operating its shooting facility "until such time that [the Club] *obtains* permitting in compliance with KCC Titles 12 and 19." Clerk's Papers (CP) at 64 (emphasis added).

V.     *KITSAP RIFLE* III (2018)

The Club appealed the trial court's contempt order. We affirmed the contempt order. We also held that substantial evidence supported the trial court's implicit finding that the Club was able to comply with the court's order. However, we also decided that the court erred in ruling that

the Club was required to obtain an SDAP, rather than applying for one, in order to purge the contempt. We reasoned that the purge condition was punitive because actually obtaining a permit was outside the Club's control and "the Club does not have the ability to satisfy the purge condition without relying on the County's actions." *Kitsap Rifle* III, slip op. at 21.

In remanding the case, we also noted:

> [T]he fact that the Club in December 2016 did not prove its inability to comply with the trial court's supplemental order does not preclude the Club from producing new or additional evidence of an inability to comply in a future proceeding. The contemnor must be given the opportunity "at regular intervals, to present new evidence tending to show that the [sanction] has lost its coercive effect or that there is no reasonable possibility of compliance with the court order."

*Kitsap Rifle* III, slip op. at 22 (quoting *In re Pers. Restraint of King*, 110 Wn.2d 793, 805, 756 P.2d 1303 (1988)).

VI.    REMAND ORDER

On June 7, 2019, the trial court entered an amended contempt order that read, in pertinent part, as follows:

> 2. [The Club] is enjoined from operating a shooting facility until such time that: (a) [the Club] submits a complete site development activity permit ("SDAP") application to Kitsap County for permitting to cure violations of KCC Titles 12 and 19 found to exist on the Property in the original Judgment (hereafter "Purge Condition"); (b) [the Club] *proves in a future proceeding that it does not have the ability to comply with the permitting order in the Supplemental Judgment, such as by proving it does not have the ability to perform the Purge Condition*; or (c) [the Club] proves in a future proceeding that it is no longer in contempt, such as by proving that all violations of KCC Titles 12 and 19 found to exist on the Property in the original Judgment have been abated or that [the Club] *lacks the ability to cure violations of KCC Titles 12 and 19* found to exist on the Property in the original Judgment.

CP at 68 (emphasis added).

5

On June 20, 2019, the Club filed a motion to terminate the trial court's contempt sanction. The Club argued that the coercive sanction should be terminated because it lacked the funds necessary to submit a complete SDAP application and was therefore unable to perform the purge condition.

In support of its motion, the Club submitted an e-mail from the County stating that the Club would be required to file an application for an SDAP-Commercial as opposed to a less burdensome SDAP-Grading 2 as suggested by the Club. The Club also submitted a declaration from Barbara Butterton, a Club member who stated that she had submitted several documents to the County to initiate the process of the Club submitting an SDAP application.

In addition, the Club submitted the declaration of Marcus Carter, its executive officer. Carter stated that the application for an SDAP-Commercial would cost $6,722.40. In addition, Carter stated that the total cost of submitting the SDAP application would be $45,377.40.[3]

Carter attached the Club's treasurer's report and bank statements for 2019, which he stated were the Club's most current and accurate financial documents. These materials showed that the Club's monthly average balance for January through May was $4,760.16, and that the Club had $4,022.17 in its accounts at the end of May. The Club expected that its accounts would hold approximately $4,000 at the end of June. Carter stated that these accounts (and petty cash) represented the Club's only liquid assets. He concluded:

> The Club's only significant sources of income in 2019 have been membership dues and donations. Despite the Club's continuous and ongoing efforts to raise funds, it started the year with very little cash and has been unable to improve its financial position. The Club is also not aware of any way it can obtain a loan secured by any of its property, and even if it did it would be unable to make monthly loan payments.

CP at 99.

---

[3] He based this figure on a consultant's estimated cost and an engineer's estimation.

The County did not challenge the Club's evidence regarding the cost of submitting a SDAP application or the Club's financial resources. The County acknowledged that the Club appeared to have little liquid assets. However, the County emphasized that the Club had not presented evidence of any attempt to obtain a loan or what a monthly payment on a loan would be. The County argued that the Club "has not provided this Court with meaningful information that indicates that financial options have been exhausted, let alone sufficiently explored." CP at 154.

The County also argued that the Club had not presented any evidence of any meaningful fundraising efforts. The County noted that the Club claimed that its continuous and ongoing fundraising efforts had been unsuccessful, but that the Club had left the trial court "with the unanswered question as to what continuous and ongoing fundraising efforts look like." CP at 154.

Finally, the County argued that the Club was simply unwilling to comply with the trial court's order, not unable to comply. The County referenced Butterton's application for a waiver of certain application requirements, which stated that some requirements were a waste of time, resources and money and other requirements were not necessary or needed. The County claimed that these statements reflected the Club's true feelings about the application process.

In its reply memorandum, the Club emphasized that its property had no value, as found in the trial court's 2012 judgment, and was its only source of collateral for a loan. In the 2012 judgment, the trial court found that an appraiser had determined that the Club's property had no value because the property was lead-contaminated and a $2-3 million cleanup might be required.

The Club also submitted another declaration from Butterton, who now identified herself as the Club's president. Butterton stated that no lender would accept the Club's property as collateral for a loan because of environmental and permitting issues, and the Club had no other assets. In

addition, the Club owed over $180,000 in attorney fees for related insurance coverage litigation, which was another reason the Club could not obtain a loan.

Regarding fundraising, Butterton stated the Club's primary source of fundraising, charitable events at the shooting range, was unavailable because the range had been shut down. She stated that the Club had mailed about 150 letters to other shooting ranges, its members, and the National Rifle Association Board of Directors, but that effort resulted in less than $1,000 in donations. The Club tried to establish a GoFundMe page, but the page was rejected as too political. Finally, as a 507(c)(7) organization the Club could not receive more than 15 percent of its income from nonmember sources, which limited its ability to raise $45,000. Butterton noted that despite its fundraising efforts, the Club was "not aware at this time of any person or combination of persons willing to give it $45,000." CP at 230.

After hearing argument, the trial court denied the Club's motion to terminate the contempt sanction. It made no findings of fact. In an oral ruling, the trial court said it agreed with the County's arguments.

The Club appeals the trial court's order denying the motion to terminate the contempt sanction.

## ANALYSIS

I.     MOTION TO TERMINATE CONTEMPT SANCTION

The Club argues that the trial court erred by denying its motion to terminate the contempt sanction because it presented sufficient evidence that it was financially unable to satisfy the purge condition. Because the trial court did not abuse its discretion in determining that the contemnor could comply with the purge condition, we disagree.

8

A.      Legal Principles

We review the trial court's conclusion regarding the contemnor's ability to comply with a purge condition for an abuse of discretion.[4]  *In re Det. of Faga*, 8 Wn. App. 2d 896, 900, 437 P.3d 741 (2019).  A court abuses its discretion if there is a clear showing that the court's exercise of discretion was manifestly unreasonable or based on untenable grounds or reasons.  *Faga*, 8 Wn. App. 2d at 900.  A court also abuses its discretion if a ruling is based on an erroneous interpretation of the law.  *In re Marriage of Shortway*, 4 Wn. App. 2d 409, 418, 423 P.3d 270 (2018).

Chapter 7.21 RCW provides courts with the authority to impose sanctions for contempt of court.  Contempt of court includes the "intentional . . . [d]isobedience of any lawful judgment, decree, order, or process of the court."  RCW 7.21.010(1)(b).

The contempt statutes distinguish between remedial, or civil, sanctions and punitive, or criminal, sanctions for contempt of court.  RCW 7.21.010(2), (3); *In re Interest of Silva*, 166 Wn.2d 133, 141-42, 206 P.3d 1240 (2009).  Remedial sanctions are "imposed for the purpose of coercing performance when the contempt consists of the omission or refusal to perform an act that is yet in the person's power to perform."  RCW 7.21.010(3).  Punitive sanctions are imposed "to punish a past contempt of court for the purpose of upholding the court's authority."  RCW 7.21.010(2).  A civil contempt sanction that is punitive rather than coercive is invalid.  *Faga*, 8 Wn. App. 2d at 900.

To qualify as remedial, a contempt sanction must allow the contemnor to purge the contempt by committing an affirmative act.  *Faga*, 8 Wn. App. 2d at 900.  In addition, the contemnor must have the ability to satisfy the purge condition.  *Faga*, 8 Wn. App. 2d at 900-01.  A sanction becomes punitive when the contemnor cannot purge the contempt.  *In the Matter of*

---

[4] The person subject to contempt is referred to as the "contemnor."

*Rapid Settlements, Ltd.*, 189 Wn. App. 584, 613, 359 P.3d 823 (2015). "When a contemnor cannot control whether to purge the contempt because purging the contempt is dependent on the actions of third parties, outside of the contemnor's control, the purge condition is inappropriate." *Faga*, 8 Wn. App. 2d at 902.

A remedial sanction may become punitive if circumstances change. When a sanction loses its coercive effect, such as when a contemnor loses his or her ability to comply with the violated court order, the trial court must terminate or modify the sanction. *Faga*, 8 Wn. App. 2d at 900-903.

The law presumes that the contemnor is able to perform actions that the court orders. *Faga*, 8 Wn. App. 2d at 901. Therefore, the inability to comply is an affirmative defense and the contemnor bears the burden of proof. *Faga*, 8 Wn. App. 2d at 901. The contemnor must offer credible evidence regarding the inability to comply. *Faga*, 8 Wn. App. 2d at 901.

In *Britannia Holdings Ltd. v. Greer*, 127 Wn. App. 926, 929-30, 113 P.3d 1041 (2005), the trial court found the contemnor, a judgment debtor, in contempt for disobeying multiple orders to deliver assets. The trial court issued a purge order requiring the debtor to pay $635,000 or be jailed for contempt. *Greer*, 127 Wn. App. at 929-30. On appeal, we reversed the contempt sanction because the trial court failed to make a finding that the contemnor had the present ability to comply with the court's order for the payment. *Greer*, 127 Wn. App. at 933-34. The court reasoned that a contemnor in civil contempt must hold the keys to his jail cell in his own pocket. *Greer*, 127 Wn. App. at 928.

B.     Ability to Comply with Purge Condition

In *Kitsap Rifle* III we stated that a trial court must make at least an implicit finding that a contemnor could comply with a court order before imposing a contempt sanction. No. 50011-6-

10

II, slip op. at 15. We conclude the same rule applies when a court rules on a motion to terminate a contempt sanction.

The trial court here made an implicit finding that the Club had the financial ability to comply with the purge condition in the 2019 amended order. We review this finding to determine if it is supported by substantial evidence. *Cuesta v. Emp't Sec. Dep't*, 200 Wn. App. 560, 570, 402 P.3d 898 (2017). Evidence is substantial if it persuades a reasonable person of the truth of the premise asserted. *Cuesta*, 200 Wn. App. at 570.

Although the Club submitted some evidence of its financial situation, it failed to present tax returns, statements of assets and liabilities, and bank statements. These are the exact type of documentation that we concluded the Club failed to present previously. We previously concluded that "the lack of detailed evidence" was fatal to the Club's claim that it was unable to comply with the court's order. *Kitsap Rifle* III, slip op. at 16.[5]

We note that the Club once again failed to present the documentation that we specified should be presented, such as tax returns, and asset and liability reports. As before, we again conclude that "the lack of detailed evidence" was fatal to the Club's claim that it was unable to comply with the court's order. *Kitsap Rifle* III, slip op. at 16.

---

[5] We are aware that, Carter submitted the Club's treasurer's reports and bank statements for 2019, which he represented were the Club's most current and accurate financial documents. However, they were incomplete. They lacked the documents we specified should be presented, i.e. tax returns, statements of assets and liabilities, or bank statements. *Kitsap Rifle* III, slip op. at 16.

The Club also failed to present evidence that it had applied for loans or that the loans had been rejected.[6] In addition, the Club did not present any evidence of any meaningful or significant fundraising efforts.

The Club failed to present evidence that no lender would be willing to loan $45,000 to them. It merely provided opinions based on pure speculation. The Club neither applied for loans nor requested deferred payment arrangements with its consultants.

We conclude that substantial evidence supported the court's implicitly ruling that the Club had the financial ability to purge the contempt order. We also conclude that the court did not abuse its discretion in determining that the club did not meet its burden to show that it could not financially purge the contempt order.[7]

## CONCLUSION

We conclude that the trial court did not abuse its discretion in determining that the Club had the financial ability to perform the contempt sanction's purge condition. We affirm.

---

[6] The evidence the Club submitted on this issue was Carter's testimony that the Club was "not aware of any way it can obtain a loan secured by any of its property" and, even if it did, the Club "would be unable to make monthly loan payments." CP at 77. However, this conclusory statement is mere speculation. The Club should have presented facts that it applied for loans and that the lending agencies denied them. Although the Club's land might require an expensive clean up, the Club failed to present evidence of the property's value after a cleanup.

[7] The Club argues that we should disregard the County's following arguments because it raised them for the first time on appeal: that the Club should have disclosed additional financial reports, that the Club should have attempted to work out a payment arrangement with its consultants, and that the Club's $45,000 cost estimate lacked credibility because its first estimate was $158,000. Because these arguments are not novel and they do not inject new facts into the record, we disagree with the Club.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

I concur:

_____
Cruser, J.

MAXA, J. (dissenting) – The record demonstrates that the Kitsap Rifle and Revolver Club (Club) satisfied its burden of demonstrating that it is financially unable to perform the purge condition of the trial court's sanction. Therefore, I believe the trial court erred in denying the motion to terminate the contempt sanction because the Club established that it was unable to satisfy the purge condition. Accordingly, I would reverse and remand for the trial court to terminate the sanction.

When a contemnor loses his or her ability to comply with the contempt order's purge condition, that sanction becomes punitive rather than coercive and the trial court must terminate the sanction. *In re Det. of Faga*, 8 Wn. App. 2d 896, 900, 437 P.3d 741 (2019). The trial court apparently made an implicit finding that the Club did not show that it did not have the financial ability to comply with the purge condition in the 2019 amended order. Substantial evidence does not support that finding.

1.    Ability to Pay Cost of Application with Liquid Assets

Marcus Carter, the Club's executive officer, attached the Club's treasurer's report and bank statements for 2019, which he stated were the Club's most current and accurate financial documents. These materials showed that the Club's monthly average balance for January through May was $4,760.16, and that the Club had $4,022.17 in its accounts at the end of May. The Club expected that its accounts would hold approximately $4,000 at the end of June. Carter stated that these accounts (and petty cash) represented the Club's only liquid assets. In addition, the Club submitted evidence that submitting an SDAP-Commercial application would require the club to incur approximately $45,000 in expenses. The County did not contest this evidence. And in the trial court, the County acknowledged that the Club appeared to have little liquid assets.

14

The majority opinion states that the Club could have presented additional financial information such as tax documents and asset and liability reports. In *Kitsap Rifle* III, the Club relied only on the unsupported declaration of Carter to show the Club's assets. *Kitsap County. v. Kitsap Rifle*, No. 50011-6-II, slip op. at 15-16 (Wash. Ct. App. Jan. 30, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2050011-6-II%20Unpublished%20Opinion.pdf (*Kitsap Rifle* III). The Club failed to present any documentation showing its financial situation, including tax returns, assets and liabilities, or bank statements. *Id*. We concluded that "the lack of detailed evidence" was fatal to the Club's claim that it was unable to comply with the court's order. *Id*. at 16.

But here, Carter submitted the Club's treasurer's reports and bank statements for 2019, which he represented were the Club's most current and accurate financial documents. These were the type of documents that were missing when this court rejected the Club's challenge to the issuance of the 2016 contempt sanction. *See Kitsap Rifle* III, No. 50011-6-II, slip op. at 15-16. Nothing in the record suggests that some other documents would have revealed additional assets.

The record clearly shows that the Club did not have sufficient liquid assets to comply with the purge condition in the 2019 amended order.

2. Ability to Obtain Loans to Pay Application Expenses

The majority opinion notes that the Club failed to submit any evidence that it was unable to obtain a loan to pay or credit from its consultants for the application expenses. However, the evidence the Club did submit shows that it was highly unlikely that the Club could obtain a loan or credit.

Carter testified that the Club was "not aware of any way it can obtain a loan secured by any of its property" and, even if it did, the Club "would be unable to make monthly loan payments." CP at 77. Barbara Butterton, the Club's president, stated:

> With the potential for environmental liability and unresolved site development violations, no lender will accept the Club's real property as collateral. The Club has no other assets that could possibly be considered as collateral for a loan of over $45,000. Instead, the Club has significant unpaid liabilities, such as for legal representation against its liability insurer, Northland Insurance Co. The Club owes over $180,000 in attorney fees for that work.

CP at 230.

Further, the trial court entered an unchallenged finding of fact in the 2012 judgment that the Club's real property had been valued by a certified appraiser at "$0" based on the property's "continued use for shooting range purposes and the potential costs of environmental cleanup." CP at 6-7. The appraisal revealed that the property was "lead-contaminated and that a $2-3 million cleanup may be required for the property." CP at 6.

There was no indication in the record that a lender would be willing to loan $45,000 to an entity with $4,000 in liquid assets and an outstanding $180,000 debt when the only possible collateral was lead-contaminated property that had been appraised as having no value. The majority opinion does not assert that the Club actually could have obtained a loan, only that it should have tried to apply for one. But the Club should not be required to engage in a futile act in order to prove an inability to satisfy a purge condition. *See Larson v. State*, 9 Wn. App. 2d 730, 745, 447 P.2d 168 (2019), *review denied*, 194 Wn.2d 1019 (2020) (stating that "the law does not require futile acts").

Similarly, there was no indication in the record that the Club's consultants would have been willing to extend credit to a client with $4,000 in liquid assets and an outstanding $180,000 debt to another professional who was assisting in the Club's efforts to reopen the shooting range.

16

The majority opinion states that the Club's position that it could not have obtained a loan or credit is based on mere speculation. But it is the majority that is speculating that the Club could have obtained a loan or credit given the Club's financial condition.

The record clearly establishes that the Club could not have obtained a loan or credit in order to comply with the purge condition in the 2019 amended order.

3.  Ability to Obtain Donations to Pay Application Expenses

The majority opinion states the Club did not present evidence of any meaningful or significant fundraising efforts, apparently suggesting that the Club could have done more to seek donations to fund the SDAP application.

The Club presented evidence that it solicited donations, but that the donations received were insignificant. Butterton stated:

> It is no secret that the Club is a non-profit that accepts donations. The Club has specifically asked for them since receiving the 2012 trial decision, such as by sending about 150 letters to shooting ranges, their members, and the NRA Board of Directors. That effort generated less than $1,000 in donations. Meanwhile, GoFundMe rejected a page intended to collect donations for the Club because it considered the effort too political.

CP at 230. Butterton noted, "In spite of its fundraising efforts, the Club is not aware at this time of any person or combination of persons willing to give it $45,000." CP at 230.

Butterton identified two limitations on the Club's fundraising efforts. First, the closure of the shooting range "has deprived the Club of one of its primary means of fundraising, which was to host charitable events." CP at 230. Second, "the Club is registered with the IRS as a 501(c)(7) organization, which means no more than 15% of its gross income can come from non-member sources." CP at 230. This means that the Club would need to have $255,000 in income from member sources to be able to accept $45,000 from outside donors.

There was no indication in the record that the Club had the ability to obtain donations totaling $45,000. The majority apparently believes that the Club should have tried harder. But as noted above, the Club should not be required to engage in a futile act in order to prove an inability to satisfy a purge condition. *See Larson*, 9 Wn. App. 2d at 745.

The record clearly shows that the Club could not have obtained a sufficient level of donations in order to comply with the purge condition in the 2019 amended order.

4.    Summary

I conclude that substantial evidence does not support the trial court's implicit finding that the Club was financially able to satisfy the purge condition in the 2019 amended order. Therefore, I would hold that the trial court erred in denying the Club's motion to terminate the contempt sanction in the 2019 amended order. Accordingly, I dissent.

Maxa, P.J.