IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GERALDINE A. MANIATIS LIVING TRUST, | No. 86872-1-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| MALKIT SINGH AND KAUR RANJIT, and the marital community composed thereof, | |
| Appellants. | |

COBURN, J. — This is the second appeal between parties involved in this water trespass dispute. In the prior appeal, this court upheld the trial court's determination that Malkit Singh had trespassed by redirecting water onto the Maniatis Living Trust property and ordered an injunction requiring Singh to abate the flow at his own expense. Despite these rulings, Singh failed to comply, leading the Trust to seek enforcement through contempt proceedings. Singh appeals the trial court's finding of contempt and award of attorney fees. Finding no error, we affirm.

FACTS

Malkit Singh and Kaur Ranjit (collectively "Singh") and their neighbors have been litigating a water trespass dispute since 2016. Geraldine A. Maniatis Living Tr. v. Singh, No. 53127-5-II, slip op. at 6 (Wash. Ct. App. Dec. 22, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2053127-5-

II%20Unpublished%20Opinion.pdf.[1] We repeat some facts from that opinion as needed to provide context. Singh purchased two adjacent properties in Tacoma in 2011. The properties slope down to the north and east toward a home owned by the Geraldine A. Maniatis Living Trust (Trust) and a home owned by Kim Tosch. A wetland, designated by the City of Tacoma, and its associated buffer span the north half of both Singh properties. The western portion of the Trust property and the southern portion of the Tosch property are designated as part of the wetland buffer. A natural spring has continuously flowed on the Singh properties since at least the 1970s. Prior to Singh's ownership, the spring flowed out from beneath a corner of the foundation of the house at 2307, combined with other surface runoff, and traveled downhill into a man-made pool that would overflow. From there, the water passed through a channel leading into a drainpipe, eventually reaching the Tosch property. It then entered a drainage system that directed the flow to the street and into the city's storm sewers. Before 2015, neither the spring water nor the overflow from the pond ever reached the Trust property.

In 2013, Singh razed the original home on one of his properties and began constructing a new home in 2015. Sometime after, Singh graded the wetland and buffer areas. In doing so, he removed the pond that previously collected the spring water. Singh also installed a drainage system. These drains collected spring and groundwater, channeling it into a dispersion trench that is designed to disperse the collected water at the edge of the wetland, which is located uphill from the Trust property and ending approximately 10 feet from its boundary.

---

[1] GR 14.1(c) provides that we may cite or discuss unpublished opinions in our opinions if "necessary for a reasoned decision." The instant case centers around a contempt finding regarding a prior court order that was upheld in this unpublished case.

The Trust and Tosch sued Singh asserting several claims that stemmed from water flowing downhill from the Singh properties onto the Trust's and Tosch's properties. Maniatis, No. 53127-5-II, slip op. at 1, 3.[2] In its final judgment, the trial court ordered that

> The flow of water…shall be stopped as it relates to the Maniatis Property on or before September 15, 2019, unless good cause be shown, and the Defendants are therefore permanently enjoined from any further water movement onto the Plaintiff Maniatis' Property as described in the Plaintiff Maniatis' Complaint and as further demonstrated in this Court's February 25, 2019, Findings of Fact and Conclusions of Law.

On appeal, this court[3] affirmed the trial court's determination that Singh negligently trespassed onto the Trust property by channeling the flow of water and depositing it directly adjacent to and uphill from the Trust property.[4] Maniatis, No. 53127-5-II, slip op. at 18. The court also affirmed the trial court's order of an injunction to abate the ongoing flow of water from the Singh property to the Trust property at Singh's sole cost and expense. Maniatis, No. 53127-5-II, slip op. at 23 . This court rejected Singh's "impossibility and 'cannot comply' arguments." Maniatis, No. 53127-5-II, slip op. at 23. This court observed that experts, including Singh's own expert, testified about practical solutions to the problem, and that there was no evidence to suggest that

---

[2] A week before trial, Singh conveyed one of his subject properties to Tye and Katherine Minckler. The Trust amended its complaint to include the Mincklers. Maniatis, No. 53127-5-II, slip op. at 7.

[3] Division Two of this court heard the first appeal. Division Two transferred this second appeal to Division One of this court.

[4] This court concluded the trial court erred in finding the Mincklers liable. Maniatis, No. 53127-5-II, slip op. at 21. But we disagreed with Tosch that the trial court erred in determining that the wetland ceased discharging water onto the Tosch property and instead commenced discharging water only onto the Trust property, from where the water then discharged onto the Tosch property. Maniatis, No. 53127-5-II, slip op. at 30.

3

the City would not issue a permit. Id. The mandate from the first appeal issued on April 29, 2021.

In May, the Trust demanded Singh take action to abate the flow of water onto the Trust property by July 15. On August 23, Singh submitted an application to the City for a site development permit to "[a]dd landscape berm and overflow drain in lower backyard area." The Trust had filed a motion for contempt but struck the motion. On September 21, the City notified Singh that he would need a "Critical Area Development" permit because the proposed structures were within a regulated wetland and buffer, and the previous wetland permit did not cover the new proposed impacts. The City also advised Singh to contact a qualified wetlands specialist to set up a coaching, pre-application meeting. The City explained that it needed Singh to provide an agreement/easement for the installation and maintenance of proposed improvements on a neighboring parcel. However, because Singh never responded, his site development permit application sat idle for more than 180 days.

In June 2022, Geraldine Maniatis was hospitalized and later moved into a nursing home, where she later passed away. Singh's permit application was voided on July 11. Her son, James Maniatis, as personal representative of his mother's estate and trustee of the Trust, checked the status of Singh's permit through the City's website. He observed that the status of the Singh permit stated it had been "voided."

On October 11, the Trust contacted Singh[5] stating water was still flowing and that the last activity on Singh's permit was that the City voided it. The Trust demanded the water be stopped within 14 days. That same day, Singh submitted both a pre-

---

[5] Communication was through both parties' respective attorneys.

application request and a Critical Area Development Permit application to "install catch basin or create berm determined on city's authority to redirect water off Maniatis property onto Tosch[ ] property according to court order." The City explained to Gary Narwal (Singh's son and representative) that the pre-application review must be completed prior to actually applying for the Critical Area Development Permit, otherwise the application would be cancelled. Singh provided more information on November 2, and described the work as "Install catch basin or create berm determined on city's authority to redirect water off Maniatis property onto Tosche property according to court order." The additional information[6] the City received was not enough to complete a permit application.

On November 30, the Trust filed a Motion for an Order Concerning Failure to Stop Water Trespass stating that the Trust "move[s] this Court to find the Defendants in contempt because they have failed to comply with the Courts Consolidated Judgment for Plaintiffs and Permanent Injunction of March 29, 2019." At the motion hearing on December 9, Singh explained that he had a meeting scheduled with the City for December 20 regarding his permit. The court continued the hearing to January 20, 2023 and reserved on the issue of contempt and attorney fees. The court stated, "I want it emphasized in the order that the Court's order is still that the water is to be stopped by Mr. Singh, and I will look at setting a timeline for that after that December 20th meeting."

Singh's meeting with the City was held on December 21. In attendance were Singh's counsel, Narwal, Singh's wetland biologist expert Mark Heckert, an attorney from the City, and City representatives from land use and zoning, and planning and

---

[6] Singh had submitted a drainage plan, topographic landscape plan and a wetland report.

development services. The City explained to Narwal what steps in the application process were still outstanding. The pre-application review was finalized on December 23 and the City sent Narwal the City's comments as to what outstanding steps must be completed by the applicant. The City summarized those as follows:

• A Critical Area Development Permit is required for the new wetland impacts. A Joint Aquatic Resources Permit Application (JARPA) is required for submittal of a Critical Area Development Permit.

• The wetland report that was submitted is not complete. The wetland delineation data sheets are missing, and the report will need to contain an analysis of impacts to the wetland area and any mitigation for those impacts.

• The applicant must demonstrate how this project meets the critical area code through Code analysis, including a legal test. This should be part of the wetland report.

• The outflow location for the proposed drainage is new and will be located on Kim Tosch's property. Property owner signatures are required on the JARPA and Free Consent Forms for 2307 N 27th Street and the Tosch property (staff also provided the link containing the consent forms and the options on providing owner consent).

• A hydrology report will be required demonstrating pre and post development flows to the existing wetland are maintained. This is usually part of the stormwater management plan. In this case, flows may not be the issue. Capturing excess water without draining the wetland will need to be described.

• The complete list of application submittal requirements outlined in Tacoma Municipal Code 13.11.230 must be satisfied.

• A completed and signed Department of Ecology SEPA Environmental Checklist must be provided.

Staff confirmed that a SEPA DNS was issued for the development of the homes with Wetland Development Permit issued in 2008 under WET2008-40000113801 / SEP2008-40000113802.

• The 2023 Application Fees of: Critical Area Development Permit ($12,028.80) and SEPA Determination ($1,344) must be paid.

The City also informed Narwal that draining water from within the wetland boundaries may not be approvable and that "[p]rojects that need to provide drainage for additional volumes of water use an overtop outlet that is at the edge of the wetland boundary, not within it. Otherwise, the entire wetland may be drained which would not be allowed."

Prior to the January hearing, the Trust filed multiple declarations, including a declaration from Lisa Spadoni, the natural resources program supervisor for planning and development services for the City, who attested to the history and status of Singh's permit application as discussed above. James Maniatis also filed a declaration attesting to living at the Trust property and seeing the water problem continue and get worse. A declaration from a licensed real estate broker opined that the water problem will make a significant impact on the ability of the Trust to sell the property.

As of January 18, 2023, the City still did not have documents to complete the submittal of Singh's Critical Area Development Permit. On January 23, Singh filed with the trial court a "Status Update," and declarations from Singh's counsel, and Narwal. Narwal attested to anticipating Heckert completing an updated wetland delineation report in the upcoming weeks, and engaging an engineering firm that was reviewing materials provided. In the update, Singh asserted that Tosch refused to sign off on Singh's proposed drainage plan, that Singh will spend over $30,000.00 pursuing the permit, that the City has expressed doubt about the permit's feasibility, and that it could take up to a year just to find out the permit is denied. Singh asserted that he "do[es] not want to move forward with this process if it will not be permitted, or will not satisfy the court's order." Singh also asserted that he asked the Trust if it was willing to have a drain or catch basin on his side of the property line, but had not received a response.

7

It appears the January hearing was held on the 24th.[7] After considering arguments and the submitted declarations, the Court found Singh in contempt for failure to stop the water trespass and instructed him to "stop the water by April 30, 2023, unless good cause shown." Additionally, the court awarded attorney fees against Singh to the Trust, with the amount to be determined on further pleadings. The court ordered the parties to return to court on May 5, 2023, for a review hearing.

In February, Singh, Nawal and a friend "built a little berm," and "created a little channel to make sure that flow of water stays consistently coming into the wetland kind of near the Tosch property line or towards the corner of the Maniatis and Tosch property line." On April 26, the City gave Singh a Notice of Violation for installing a conveyance channel without permits in the wetland and disturbing water flow routes on the property and altering the character of the Critical Area. Singh was directed to stop work and not to proceed with additional alterations in the wetland Critical Area. That same day, Singh filed with the trial court a Notice of Compliance with Injunction. Singh asserted there was no more water running to the Trust property. Singh submitted a declaration from hydrologist Richard Martin who visited the wetland on April 5, 2023 and concluded that there is nothing anyone can do to the wetland to resolve the Trust property water problem, and that the water on the Trust property is coming from the Trust property, exacerbated by detached downspouts.

The trial court rescheduled the hearing from May 5 to June 15 in order to take testimony, evidence, and hear argument on the issues of whether Singh complied with

---

[7] There is no explanation in the record as to why the January 20 hearing was continued to January 24 and we do not have the verbatim report of proceedings from the January 24 hearing as it was not included in Singh's statement of arrangements.

the court's injunction, and what actions the court should take if Singh has or has not complied with the injunction.

The hearing occurred over two days. Multiple witnesses testified, including Spadoni from the City, Narwal, Maniatis, Tosch, Martin as Singh's expert, and principal hydrogeologist Michael Piechowski as expert for the Trust. The primary issue was whether Singh complied with the injunction. Singh claimed that the water flow onto the Trust property had ceased.

Singh's son, Narwal, testified that in an attempt to abate the water trespass themselves, they created a channel because they noticed a little spring and that water was flowing from the Trust property into the wetland. Narwal explained that they created "a little berm just to make sure that any water that could have trespassed from above the wetland does not infiltrate into the Maniatis side at all." When asked whether the cost of the permitting process impacted Singh's decision to proceed with permitting, Narwal answered,

> No. It was the timeliness of getting the permit and meeting the Court's order. We were happy to do the job as it needed to be done, but weren't getting the approvals we needed in time. And then we had to do the repairs by taking matters into our own hands to make sure that the job was done, the work that the Court ordered was to be completed.

Narwal conceded at trial that they did not start physical work or serious permitting until after the trial court's January 2023 order of contempt. Narwal explained:

> We started the work after - - yes, after the order was given because we noticed that - - at first we didn't notice any water going on - - any surface water going onto the Maniatis property. And as Tosch started to build her berm, we thought that they had figured something out together or something.

9

Martin, Singh's expert, testified that he conducted a site visit to the Singh property in March 2023. During that visit, he did not have access to the Trust property but observed it by looking over the fence and through the fence in places, and taking some photos of the site. He did not observe any water running from the wetland to the Trust property or any water entering the Singh property from the Trust property. Martin testified that he could not tell if there is any groundwater flowing from the Singh property to the Trust property, but agreed that there is groundwater on the Singh property that is part of the wetland and that it very well could flow onto the Trust property. When asked if there was surface water flowing from the Singh property to the Trust property, could something physically be built to stop that from happening, Martin said, "I suppose so, yes."

Piechowski, the Trust's expert, testified that he visited the site in May 2023. He testified to what he observed that day:

> Well, the bulk of the property was fairly dry. The northwest corner which adjoins both the Tosch property and the Singh property is the apparent lowest elevation on the property. That ground was very wet. The lawn had been freshly mowed. I noticed standing water in that corner and noticed water flowing from beneath the fence separating the Singh property from the Maniatis property. That water was flowing onto and downhill towards the Maniatis property.

Piechowski also testified that water was flowing downhill onto the Maniatis property beneath the fence. Piechowski also testified to his observations of the Singh property:

> The limited observations I made of the Singh property were based on looking over or through the fence. And I did see evidence of wet ground, standing water possibly, but it would be a hard call to say that I actually saw standing water. There was definitely saturated soil at a higher elevation than the Maniatis property, and there was water flowing from the Singh property towards the Maniatis property.

Piechowski opined that the source of the water on the Trust property did not appear to be from the Trust property, and, instead, appeared to be from uphill on the Singh property. Piechowski explained that he did not see any flow paths on the Trust property that would suggest the source of the water in the problem corner is from the Trust property. He further testified that

> there could be a number of different solutions, but all of these solutions would have to take into account the fact that you can't fill your way out of a spring problem. You have to provide drainage because if you fill the spring, the water level from the spring will continue to rise until it reaches a drainage point or it reaches the head of the aquifer feeding that spring.
> ….
> I don't think that it's possible to fill one's way out of this property without providing a drain. The water's got to have somewhere to go. If you fill a spring, water will rise to the next lowest point to drain. In this case, it appears to be the Maniatis property.

Spadoni, from the City, also testified to the history and status of Singh's permit applications with the City. Spadoni summarized Singh's request:

> The proposal that was before us was a drainage channel excavated in the wetland and buffer with a catch basin in the wetland. Our understanding of what the attempt was, was to take excess water coming from the house or the area of the house that was flowing through and into the wetland, was capturing that water that was excess, not needed to preserve the wetland hydrology and direct it away from or into appropriate storm drainage systems.
>         And so the discussion was if there's extra water not needed to maintain wetland hydrology, demonstrate that to us, that you needed to capture that water, but that you weren't also draining out the necessary hydrology to maintain the wetland system.

Spadoni explained that the reason Tosch's permission was required was because it was Singh who proposed connecting a new outfall onto the Tosch property. The City also had communicated to Singh that projects that need to provide drainage for additional volumes of water use an overtop outlet that is at the edge of the wetland boundary, not

11

within it. Otherwise the entire wetland may be drained, which would not be allowed. Spadoni explained

> It's very common for us when we receive a project application that we feel may not meet code to let an applicant know that so that we can work with them to come up with an application that could be approvable. That is very common for us to provide that type of information to an applicant so that they can work with us to modify their application.

Spadoni testified that the City issues Critical Area permits in less than 120 calendar days depending on the permit application, and that state law required the City to maintain a 120-day timeline. The City in December 2022 communicated to Singh the outstanding items in his application. When Spadoni testified at trial in June 2023, she said Singh has never achieved a complete application for the Critical Area permit.

At the end of trial, the court requested parties to submit their closing arguments in writing. The court then issued its letter ruling on July 27, 2023.

After examining both testimony and evidence, and considering the case's history, the court reiterated that water was flowing onto the Trust property in 2018-2019 when the first trial was held and the injunction was entered, and "water continues to flow onto the property today." The court found Singh not in compliance with the injunction. Moreover, the Court found that Singh applied for a Site Development Permit, in 2021-2022, but did not address the City of Tacoma's requested revisions. Consequently, the application was voided by the City on July 11, 2022, after remaining inactive for more than 180 days. Subsequently, the court found that on October 11, 2022, Singh submitted a Critical Area Permit application. This application included some information requested by the City, such as a drainage plan, a topographic landscape plan, and a wetland report, and Singh attended a pre-application meeting on December 21, 2022.

However, the court found after this meeting, Singh took no further action with the City and appears to blame the trial court for his inaction because of the looming April 30, 2023 deadline to stop the water flow.

The court found Singh in contempt stating that it is evident that he was unwilling to take corrective action unless compelled by the court. The Court also recognized that some actions are within Singh's control while others are not. The Court specifically found that Singh had control over which plan he submits to the City of Tacoma to address the issue, as well as the ability to secure most of the required materials, as referenced in Spadoni's declaration and testimony. The court found that although Singh cannot control aspects like a neighbor's approval, if necessary, or the City's response time, he retained responsibility for submitting a compliant plan and providing the necessary supporting documentation.

To enforce compliance, the court imposed "a remedial sanction for the purpose of coercing [Singh] to perform an act that is in his power to perform, namely, to submit a plan with the necessary supportive documentation to the City of Tacoma that will comply with the Court's injunction. The Court is imposing a sanction of $100.00 per day until that is accomplished." The court said it will entertain a motion to stop the sanction once the completed plan is being reviewed by a neighbor for approval (if necessary) and once the plan has been submitted to the City of Tacoma for approval. The court reasoned that the "timeline is then out of [Singh's] hands and there should be no sanction for the time taken by others to review." The court ordered Singh to begin payment on July 31, 2023, awarding the Trust attorney fees and costs. The court explained it would consider a motion to adjust the sanction if there were delays due to

13

the neighbor's review or the City's approval process. After the Trust submitted its request for attorney fees, costs and a proposed order, Singh filed his response and objections to the proposed order. The court issued its order on September 15, 2023, incorporating its July 27, 2023 letter ruling's factual findings and conclusions of law without limitation.

Singh appeals.

## DISCUSSION

### Contempt

Singh asserts that the trial court failed to satisfy the procedural and substantive requirements necessary to hold him in contempt.[8]

This court reviews a trial court's contempt order for abuse of discretion. Weiss v. Lonnquist, 173 Wn. App. 344, 363, 293 P.3d 1264 (2013); Moreman v. Butcher, 126 Wn.2d 36, 40, 891 P.2d 725 (1995) (quoting In re Pers. Restraint of King, 110 Wn.2d 793, 798, 756 P.2d 1303 (1988) ("Whether contempt is warranted in a particular case is a matter within the sound discretion of the trial court; unless that discretion is abused, it should not be disturbed on appeal.")).

Washington courts have long held that "the moving party has the burden of proving contempt by a preponderance of the evidence." In re Marriage of James, 79 Wn. App. 436, 442, 903 P.2d 470 (1995) (rejecting outright an argument that "the moving party [must] establish contempt by clear, cogent and convincing evidence").

---

[8] Singh also contends that the standard of review should be clear and convincing evidence to establish civil contempt. We disagree. This case is a civil, not criminal, matter. Under RCW 7.21, the correct standard applicable in civil contempt cases is substantial evidence rather than clear and convincing evidence.

This Court's review of the trial court's fact-finding is limited to review of whether the findings are supported by substantial evidence in the record. In re Marriage of Rideout, 150 Wn.2d 337, 351, 77 P.3d 1174 (2003) (substantial evidence standard of review applies to trial court's fact-finding in support of a finding of contempt); In re Marriage of Farr, 87 Wn. App. 177, 184, 940 P.2d 679 (1997). "'Substantial evidence' means evidence that is sufficient 'to persuade a rational, fair-minded person of the truth of the finding.' So long as this substantial evidence standard is met, 'a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently.'" Blackburn v. State, 186 Wn.2d 250, 256, 375 P.3d 1076 (2016) (quoting Hegwine v. Longview Fibre Co., 162 Wn.2d 340, 353, 172 P.3d 688 (2007).

"Intentional disobedience of any lawful court order is contempt of court." Gronquist v. Dep't of Corrections, 196 Wn.2d 564, 569, 475 P.3d 497 (2020). "In addition to their inherent contempt powers, courts are statutorily authorized to impose both punitive and remedial sanctions." Id. at 569-70. "Washington's civil contempt statute outlines the court's authority to impose remedial sanctions designed to coerce a contemnor into purging continuing contempt." Id. at 570.

Washington's contempt statute provides:

> If the court finds that the person has failed or refused to perform an act that is yet within the person's power to perform, the court may find the person in contempt of court and impose one or more of the following remedial sanctions.

RCW 7.21.030(2).

Available "sanctions" include "forfeiture not to exceed two thousand dollars for each day the contempt of court continues" and an "order designed to ensure

15

compliance with a prior order of the court." RCW 7.21.030(2)(b), (c). The Court additionally may, "in addition to the remedial sanctions … order a person found in contempt of court to pay a party for any losses suffered by the party as a result of the contempt and any costs incurred in connection with the contempt proceeding, including reasonable attorney's fees." RCW 7.21.030(3).

Singh argues that the trial court erred by finding that water still flows from Singh's property onto the Trust property despite expert testimony to the contrary.

Courts should rely on expert opinion to help reach an objective, rather than subjective, evaluation of the issue. In re Custody of Stell, 56 Wn. App. 356, 368, 783 P.2d 615 (1989). However, the trial court is free to reach its own conclusions from the testimony before it. Id. Fact finders are given wide latitude in the weight to give expert opinion, and, as an appellate court, we do not reweigh expert testimony. In re Marriage of Sedlock, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993). "A trial court has the right to reject expert testimony in whole or in part in accordance with its views as to the persuasive character of [that] evidence." Brewer v. Copeland, 86 Wn.2d 58, 74, 542 P.2d 445 (1975).

Expert Piechowski testified that when he visited the Trust property in May 2023, the grass had been recently cut and he observed "surface water flowing down a hill from the Singh property onto the Maniatis property," affirming the persistence of water flow originating from Singh's land. Given the lack of measurable rain for the previous four days, the dry drain spouts, and lack of evidence of another source of water flow, Piechowski opined that the source of the water on the Trust property did not appear to be from the Trust property, and, instead, appeared to be from uphill on the Singh

16

property. Maniatis also testified to witnessing water flow from under the fence on Singh's property and continuing toward the Trust's property, which was observed as recently as June 21, 2023, demonstrating the ongoing nature of the issue. Substantial evidence supports the court's finding that water still flows from Singh's property onto the Trust property.

Singh next argues that the trial court did not find that Singh intentionally failed to comply with the injunction. But "[a]n explicit finding of intentional conduct" is not required for a contempt ruling. In re Matter of Rapid Settlements, Ltd., 189 Wn. App. 584, 604-05, 359 P.3d 823 (2015). A contempt ruling may "reflect[] an implicit finding that [the contemnor's] acts and omissions were intentional" without an express finding. Id. at 605. "Intent may be inferred from all the facts and circumstances." State v. Couch, 44 Wn. App. 26, 32, 720 P.2d 1387 (1986). "Although intent may not be inferred from patently equivocal conduct, it may be inferred from conduct that clearly indicates such intent as a matter of logical probability." Id. "In the absence of an express statement of intent, conduct will be considered as circumstantial evidence of intent." Grant v. Morris, 7 Wn. App. 134, 137, 498 P.2d 336 (1972).

Narwal, Singh's son and representative in meetings with the City regarding permit applications, testified that they did not pursue the permitting process because they were not getting approvals in time so they decided to take matters into their own hands, in February 2023, to meet the trial court's order. But Singh's first application for a site development permit, in August 2021, was voided after sitting idle for more than 180 days. Later in October 2022, when he submitted an application for a Critical Area Development Permit, the City informed him in December what documents he still

needed to submit before his application would be considered complete. The City also informed Singh that draining water from within the wetland boundaries may not be approved and advised that projects that need to provide drainage for additional volumes of water use an overtop outlet that is at the edge of the wetland boundary, not within it. Singh never completed the permit process.

Instead, he, Narwal and a friend built a berm and dug a trench in the wetlands on the Singh property without a permit. Narwal testified that they did so because they were not getting permit approvals in time and needed to do the work in order to comply with the trial court's previous order. First, the City had not denied any permits because Singh never completed his application for consideration. Second, the trial court's initial injunction had ordered Singh to comply with the injunction "unless good cause be shown." In January 24, 2023, the court again ordered Singh to stop the water by April 30, 2023, "unless good cause shown." More importantly, Narwal conceded that they did not start physical work or serious permitting until after the trial court's January 2023 order of contempt.

Substantial evidence supports the trial court's finding that Singh "is not going to take any action as directed by the Court unless he is forced to do so." The trial court's contempt ruling reflects an implicit finding that Singh's acts and omissions were intentional.

Singh next contends that the trial court took Singh's injunction satisfaction notice and associated hearing and used it to instead find Singh in contempt.

Singh heavily relies on Starkey v. Starkey, 40 Wn.2d 307, 242 P.2d 1048 (1952). In Starkey, both parties involved in a contentious divorce had violated specific

provisions of the divorce decree: the husband had failed to make child support payments, while the wife had not complied with child visitation orders. 40 Wn.2d at 310-11. Subsequently, the wife initiated execution proceedings to collect the unpaid child support from the husband's property, which led to a hearing. Id. at 311. During these post-judgment execution proceedings, the husband secured a temporary restraining order that prevented the wife and the sheriff from enforcing the writ of execution and also compelled the wife to deliver the children for visitation. Id. at 309. This procedural move brought the issue before the superior court to determine whether the wife could "show cause why the execution proceedings should not be enjoined" and whether she needed to satisfy the judgment. Id. at 312. Despite the narrow scope of the matter before it, the superior court went beyond the immediate question at the show cause hearing and found the wife in contempt of court. Id. at 311.

Starkey is distinguishable. There, the contempt finding arose in the context of post-judgment execution proceedings where multiple issues, including child support and visitation compliance, were before the court. The superior court, in Starkey, addressed issues beyond the immediate question of the execution proceedings, resulting in a contempt finding. In contrast, the sole issue in the present case has consistently been whether Singh is in contempt of court for failing to comply with the specific terms of the injunction. The contempt proceedings began when the Trust, in November 2022, filed a motion to "move this Court to find the Defendants in contempt" because they have failed to comply with the court's March 29, 2019 injunction. Specifically, the Trust alleged that the court "ordered the water to stop, and it has not therefore Mr. Singh should be held in contempt." Singh's claim is not supported by the record.

We conclude that substantial evidence supports the trial court's findings. Accordingly, we affirm the trial court's decision to hold Singh in contempt.

## Trial Court Attorney Fees

Singh contends that the trial court incorrectly awarded the Trust attorney fees because the proceedings were not contempt proceedings. As discussed above, the proceedings were contempt proceedings.

Attorney fees will not be awarded unless authorized by contract, statute, or recognized ground of equity. Brooks v. Nord, 16 Wn. App. 2d 441, 445, 480 P.3d 1167 (2021). RCW 7.21.030(3) provides that,

> the "court may, in addition to the remedial sanctions set forth in subsection (2) of this section, order a person found in contempt of court to pay a party for any losses suffered by the party as a result of the contempt and any costs incurred in connection with the contempt proceeding, including reasonable attorney's fees."

Singh next argues that the trial court was required to segregate the attorney fees reasonably incurred on the issue of contempt from those related to other matters in dispute. An award of attorney fees must "properly reflect a segregation of the time spent on issues for which fees are authorized from time spent on other issues." Loeffelholz v. C.L.E.A.N., 119 Wn. App. 665, 690, 82 P.3d 1199 (2004). Since the current proceedings were initiated in November 2022, the sole question before the court has been whether Singh abated the water flow, which was key to his compliance with the injunction. Singh's argument is without merit.

He also challenges, for the first time on appeal, the reasonableness of the Trust's attorney fees. Under RAP 2.5(a), this court generally declines to review any claim of error not raised before the trial court. Singh does not argue that any exceptions to this

rule apply. See Mullor v. Renaissance Ridge Homeowners' Ass'n, 22 Wn. App. 2d 905, 919, 516 P.3d 812, 820 (2022), review denied, 200 Wn.2d 1025, 522 P.3d 50 (2023). Singh has waived this claim of error.

## Attorney Fees on Appeal

The Trust requests attorney fees pursuant to RAP 18.1(a) and RCW 7.21.030(3). RAP 18.1(a) allows this court to award attorney fees "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review." RCW 7.21.030(3) specifically permits an award of attorney fees incurred by a party in defending the appeal of a contempt order. R.A. Hanson Co. v. Magnuson, 79 Wn. App. 497, 505, 903 P.2d 496 (1995). We find that the contempt order that Singh challenges was properly issued. Therefore, we award the Trust reasonable attorney fees subject to its further compliance with RAP 18.1(d).

We affirm.[9]

_____
Coburn, J.

WE CONCUR:

_____    _____
Feldman, J.                        Mann, J.

---

[9] Singh, on the basis of the appearance of fairness doctrine, requests a different trial court judge be assigned on remand. Because we affirm the trial court we need not address this request. In any event, Singh has not presented any evidence of judicial bias.